George R. BARBER, Petitioner,

v.

Clarence T. GLADDEN, Warden of the Oregon State Penitentiary, Respondent.

Civ. No. 62–200.

United States District Court
D. Oregon.

May 24, 1963.

Robert L. Ridgley, Portland, Or., for petitioner.

Robert Y. Thornton, Atty. Gen., and Harold W. Adams, Asst. Atty. Gen., Salem, Or., for respondent.

SOLOMON, Chief Judge.

George Barber, a prisoner in the Oregon State Penitentiary, filed a petition in this Court for a writ of habeas corpus, in which he seeks to set aside the 25-year sentence imposed upon him after he pleaded guilty in the Circuit Court of Douglas County, Oregon, to a charge of burglary with explosives in violation of ORS 164.260.

Petitioner did not appeal from his conviction, but he did file a number of proceedings thereafter. He first filed a habeas corpus proceeding in the State Court in 1955, Barber v. Gladden, 210 Or. 46, 298 P.2d 986, 309 P.2d 192 (1957), cert. denied, 359 U.S. 948, 79 S.Ct. 732, 3 L.Ed.2d 681 (1959), and again in 1958, Barber v. Gladden, 215 Or. 129, 332 P.2d 641 (1958). In 1959, he filed a petition for relief under the Oregon Post-Conviction Hearing Act, ORS 138.510 to 138.680. Barber v. Gladden, 228 Or. 140, 363 P.2d 771 (1961), cert. denied, 369 U.S. 838, 82 S.Ct. 869, 7 L.Ed.2d 843 (1962). Petitioner did not obtain relief in any of these proceedings.

In this proceeding, petitioner alleges that his present detention violates his constitutional rights under the due process clause of the Fourteenth Amendment on a number of grounds.

He *first* alleges that the indictment charging him with burglary with explosives was defective in that it failed to allege ownership of the building in which the burglary occurred. This is not a ground for relief in a federal habeas corpus proceeding unless it constitutes a denial of petitioner's rights under the Constitution. 28 U.S.C.A. § 2241. The due process clause of the Fourteenth Amendment requires that a criminal defendant in a State Court be given reasonable notice and information of the specific charge against him, Paterno v. Lyons, 334 U.S. 314, 320–322, 68 S.Ct. 1044, 92 L.Ed. 1409 (1948), so that the defendant will be able to make his defense and protect himself after judgment against another prosecution on the same charge. United States v. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588 (1875).

The indictment charged the petitioner with unlawfully, wilfully and feloniously breaking and entering in the night "a certain building not a dwelling, to wit: Neilson's Market located at South Stephens Street near the South City Limits of the City of Roseburg," with the intent to commit larceny therein with the aid of explosives. The indictment clearly identifies the premises where the

crime was alleged to have been committed and "was sufficient to advise the accused that the state alleged that the * * * [building] did not belong to him, and that his entry was unlawful and felonious." Sedlacek v. State, 147 Neb. 834, 25 N.W.2d 533, 541, 169 A.L.R. 868 (1946). Even though ownership of the building was not specifically alleged, the indictment gave the petitioner due notice of the crime charged.

 *Second:* Petitioner alleges that his sentence is void because it was influenced by the personal bias of the sentencing Judge. No record is available of the sentencing proceeding, but petitioner's version of the incident, based upon his own recollection, is that the Judge said:

> "When I was a boy over at Drain, Oregon, my father had a grocery store and one night he returned to the store after a lodge meeting and surprised two safe-crackers in the act of blowing open the store safe. One of them turned and fired a pistol point-blank at my father just missing his head by about one inch, the bullet stuck in the front door jam, and for that reason I got no use for the likes of you and I am going to put you where the dogs won't bark at you twenty-five years in the Oregon State Penitentiary."

In the second habeas corpus proceedings, the sentencing Judge, who is now deceased, testified that at the petitioner's sentencing, he had recounted an incident from his boyhood concerning a burglary of his father's store, but he stated that petitioner's version was erroneous. The Judge denied that he had stated that his father was present when the burglars were discovered or that the burglars fired at him or at the party who discovered the burglary. The Judge also denied that he had stated "for that reason I got no use for the likes of you", or that he had made any similar statement.

In Darr v. Buford, 339 U.S. 200, 218, 70 S.Ct. 587, 597, 94 L.Ed. 761 (1950), the Court defined the standard to be applied where the fairness of a State Court proceeding is questioned.

> "A conviction after public trial in a state court by verdict or plea of guilty places the burden on the accused to allege and prove primary facts, not inferences, that show, notwithstanding the strong presumption of constitutional regularity in state judicial proceedings, that in his prosecution the state so departed from constitutional requirements as to justify a federal court's intervention to protect the rights of the accused."

The testimony here is insufficient to warrant even an inference that the sentencing Judge was biased against petitioner.

 *Third:* The sentence was void because the Judge considered an unsworn statement prejudicial to petitioner.

Counsel for a co-defendant, in the presence of Barber and his attorney, told the Judge that Barber had sent a note to his co-defendants threatening their lives for having implicated Barber in the burglary.

Neither at that time nor later that day, when he was sentenced, did Barber avail himself of the opportunity to deny the threat or to demand the production of the note. He merely told the Judge that he could "take the statement with a grain of salt."

At the Post-Conviction hearing the Judge testified: "I don't know whether there was any note or not. It was never established in my mind that there was, because it wasn't there."

Barber's only evidence that the Judge was influenced by a threatening note was a penitentiary record that "Barber was dressed into administrative segregation at commitment because of threats made against his co-partners." There is no evidence as to who communicated such information to the prison officials; in my view, it is much more likely that it was done by the District Attorney or by the Sheriff than by the Judge.

Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), upon

which petitioner relies, is not in point. In that case the Judge, before sentencing an illiterate unrepresented defendant, read from a list furnished him by the prosecutor, which list showed that the defendant had seven prior convictions. At the time the Judge sentenced defendant to a term of 10 to 20 years imprisonment, he was unaware that the list was incorrect and that the defendant had been found not guilty on two charges and a third had been dismissed.

There is insufficient evidence to warrant the conclusion that the Judge believed that petitioner had threatened his co-defendant or that the Judge was influenced in any way by it. In addition, by his failure to object to the unsworn statement or to make any statement in mitigation, Barber waived any objections he may have had. Williams v. Oklahoma, 358 U.S. 576, 583, 79 S.Ct. 421, 3 L.Ed. 2d 516 (1959); Barber v. Gladden, 228 Or. 140, 363 P.2d 771 (1961).

*Fourth:* The sentence is void because the Judge acted arbitrarily in fixing a 25-year sentence.

At the hearing on his second habeas corpus petition, Barber called the sentencing Judge as a witness. Barber asked the Judge the following question:

"In the case of State v. Boloff [138 Or. 568, 4 P.2d 326], 7 P.2d 775, Justice Rossman said, 'a careful judge apprises himself concerning the defendant's past life, his capacity to comply with the adopted standards, and his former attitude towards law and order.' As the sentencing judge in my case do you think you met the requirements laid down by that?"

The Judge replied:

"Yes, I do, and I will tell you why if you want to know. It was brought to my attention that you had a long criminal record. You had been in prison—in the penitentiary at Walla Walla and also in the Oregon State Penitentiary, and in considering that I figured when you got out you would have paid your debt to society, but one of my duties was to consider the question of the deterrent effect that it would have on you and other criminals, *and the maximum sentence was forty years, and I thought in view of your plea of guilty you should have credit for that, and I gave you fifteen years credit, which is all I think you are entitled to."*

Barber bases his claim of arbitrary action on the portion of the Judge's testimony which I have italicized.

The plea of guilty was only one factor which the Judge considered. Many judges—perhaps most judges—when imposing sentence, consider whether the defendant pleaded guilty or was found guilty. LUMMUS, THE TRIAL JUDGE 46–47. Some give it more weight than others, but any sentence within the statutory limits is proper, and in the absence of special statutory authority, may not be modified. Gurara v. United States, 8 Cir., 1930, 40 F.2d 338; Bryson v. United States, 9 Cir., 1959, 265 F.2d 9. See also Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958).

Is a sentence, well within the statutory limit, imposed upon a defendant who has been recently released from a State penitentiary and who has four prior felony convictions, so shocking to the conscience as to constitute a lack of due process? In my opinion it does not.

*Fifth:* His plea of guilty was involuntary and coerced because it was induced by the District Attorney's threat to prosecute him under the Habitual Criminal Act if he pleaded not guilty but was found guilty by a jury.

Barber and two other men were picked up by the police in downtown Roseburg, while sitting in a car, a few minutes after the Nielson Market, located near the south limits of the city, had been broken into with the aid of explosives. Later that evening, Barber was interviewed by the District Attorney. He told the District Attorney that he was merely a hitchhiker; that he had come to Roseburg from the nearby town of Myrtle

Point to look for his niece; that while he was in the Greyhound Bus Depot he met his two companions, neither of whom he had ever seen before. On the next day, Barber admitted that much of his story was false and that he had known his companions for several days. However, he denied ever having been in any prior trouble. Several days later, he asked to see Sergeant Holcomb, the arresting officer. By this time Barber knew that Holcomb had taken his finger prints to Salem (Oregon State Penitentiary) and had learned of his long record. Barber also knew that both of his companions had confessed and had implicated him. Barber asked Holcomb to use his good offices to get the District Attorney to reduce the charge from Burglary with Explosives to Burglary. He made the same request on subsequent occasions, but each time Holcomb refused.

Barber retained Donald Kelly, a local lawyer with criminal experience. Kelly had been a Deputy District Attorney who had left that office after a change in administration.

Barber testified that Kelly informed him that he, Kelly, had discussions with the District Attorney and that the District Attorney threatened that if Barber pleaded not guilty, and if after a trial he were found guilty, the District Attorney intended to file a Habitual Criminal charge against him. They discussed the fact that under the Habitual Criminal Act Barber's minimum sentence would be 80 years and it might be life. They also discussed the sentence that he would likely receive if he pleaded guilty. Barber testified that Kelly stated that the Judge was a very conscientious man in imposing sentences and that he guessed that Barber would receive a 15-year sentence. Barber also submitted the affidavits of four of his fellow prisoners at the Oregon State Penitentiary who were also with him in the Douglas County Jail. All four of them asserted that either the District Attorney told them of his threat to invoke the Habitual Criminal Act unless Barber entered a plea of guilty or that they overheard the jail-ers communicate the same threat. Two of the four apparently pleaded not guilty, were convicted, and are now serving life sentences under the Habitual Criminal Act.

Kelly's testimony partially corroborated Barber. He testified that after being retained by Barber, he discussed the case with the District Attorney, who indicated that if the case were tried and Barber found guilty, he intended to file a Habitual Criminal charge against Barber. Kelly further stated that he communicated this information to Barber. Barber did not disclose whether he was innocent or guilty, but they discussed the evidence that was available against Barber and the fact that the testimony of the accomplices alone was not sufficient to convict. Kelly told Barber that he would not advise him to plead guilty if he were innocent, but if he were guilty he should consider the consequences of the Habitual Criminal Act. He told Barber that he considered the Judge to be very jealous of the rights of an accused; that he was fair in his sentencing; he did not know what the Judge would do—he might impose a sentence of 5 years or 40 years, but in view of Barber's prior record he thought it would be in the neighborhood of 15 years. Kelly stated that statements concerning the Habitual Criminal Act were made during a discussion of Barber's past criminal record; that he did not regard the District Attorney's remark as a threat; and that he was sure that Barber's plea of guilty was voluntary and without any duress.

The District Attorney did not recall the discussions concerning the Habitual Criminal Act, but thought that in view of Barber's past record it may very well have been discussed, and he did not believe that he made the invoking of the Act conditional upon Barber's pleading not guilty. However, he did not invoke the Act because he thought that the sentence of 25 years was adequate.

At the trial before this Court, Barber frankly admitted that he was guilty of the crime and stated that he had never

denied his guilt. However, he asserted that his plea was coerced and should be set aside on constitutional grounds.

A plea of guilty must be entered freely and voluntarily and without any coercion. It must be essentially free and unconstrained. The use of threats or promises calculated to deprive a defendant of his freedom of choice is a denial of procedural fairness guaranteed by the Fourteenth Amendment and vitiates a plea of guilty which is so induced. Likewise, defendant is deprived of his constitutional rights if he is deceived or coerced by a prosecutor into entering a guilty plea. Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed. 2d 473 (1962); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Walker v. Johnston, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941); Euziere v. United States, 10 Cir., 1957, 249 F.2d 293.

The issue in this case is not whether Barber was guilty of the crime charged in the indictment, but whether his plea of guilty meets the high standard of procedural due process guaranteed him by the Fourteenth Amendment.

If defendant's plea of guilty was coerced, he is entitled to have it set aside, and his guilt is irrelevant. However, his guilt is not irrelevant on the issue of whether his plea was, in fact, coerced.

In my view, the evidence in this case does not establish that Barber's plea of guilty was coerced or that the plea did not meet the high standard of procedural due process.

This is not a case in which a District Attorney contacts an inexperienced or unintelligent defendant and urges him to plead guilty, and when the defendant refuses to plead or is reluctant to do it, threatens to invoke the Habitual Criminal Act, or seduces the defendant by offering to permit him to plead to a lesser charge. Here the defendant is a shrewd and able man with considerable prison experience. Shortly after his arrest and even before he retained a lawyer, he initated the bargaining process by calling for Sergeant Holcomb, the arresting officer. He urged Holcomb to use his good offices to get the District Attorney to reduce the charge against him. When this effort failed, Barber hired an experienced lawyer. Barber knew that his companions had confessed and that they had implicated him. He also knew about the newspaper story which indicated that other people may have witnessed the robbery.

Even without being told of the conversation between his lawyer and the District Attorney concerning the Habitual Criminal Act, Barber with his experience and with his prior criminal record knew that there was a definite possibility that if he entered a plea of not guilty but was found guilty after trial, the Habitual Criminal Act might be invoked.

Certainly the Habitual Criminal Act was a proper and necessary subject for discussion between Barber and his lawyer, and probably between his lawyer and the District Attorney, particularly since Douglas County, which is not one of the populous counties in Oregon, sent more persons to the Oregon State Penitentiary under the Habitual Criminal Act than any other county in the State except two, Multnomah County and Clackamus County.

Barber knew that his two accomplices, who had implicated him, had received three-year sentences. He also knew that the charge against him, "Burglary with Explosives", provided for a 5-year minimum and 40-year maximum. Barber hoped to receive either eight or nine years, and not more than the 15 years which his lawyer had guessed would be the sentence.

Barber was deeply disappointed when he was sentenced to a 25-year term; and after spending two years in the penitentiary, filed his first petition for habeas corpus. In this petition he did not claim that his plea was coerced, but he did claim that he was denied "equal protection of the laws" because his two accomplices were permitted to plead to

the crime of "Burglary Not In A Dwelling", for which they received only three-year terms. Barber also complained of the length of the sentence and asserted that it constituted "cruel and unusual punishment". It was not until four years after his sentence that Barber first raised the issue of coercion.

The question of whether a defendant's plea of guilty was involuntary or coerced is a question of fact.

I do not believe that a statement by a prosecutor that he will invoke the Habitual Criminal Act against a defendant who pleads not guilty, but is found guilty, always requires that the plea be set aside as being involuntary and coerced. Nor do I believe that discussions between a defendant's lawyer and a prosecutor which result in the filing of a charge of "Burglary" or "Burglary Not In A Dwelling", instead of "Burglary with Explosives", or a charge of "second degree" rather than "first degree murder" or a charge of "mail robbery", instead of "mail robbery with the use of a dangerous weapon", always make a plea to the lesser charge involuntary and coerced. The same is true when a defendant is charged with a greater crime but is permitted to plead to a lesser one; or, when he is permitted to plead to one or two counts in a multiple count indictment.

These are commonplace occurrences in courts throughout the country. We do it in the Federal District Court. On multiple count indictments, we often accept pleas of guilty to one or two counts, particularly in indictments charging violations of the income tax laws, the Interstate Commerce Act, or even the narcotics laws. In many courts, particularly State courts, a defendant's lawyer and the prosecutor may bargain not only on the offense, but also on the length of the sentence which the prosecutor will recommend.

It is an integral part of the administration of justice in the United States. It is used not only by lazy prosecutors, but also by conscientious ones to prevent the imposition of minimum sentences which either the prosecutor or the defendant's lawyer, or both, believe will be unconscionably long.

Barber, with full knowledge of his guilt and the probabilities that the District Attorney would be able to prove it, elected to plead guilty to the charge of "Burglary with Explosives". He did it only after he was unable to induce the District Attorney to reduce the charge to "Burglary" and only after he had discussed his predicament with his experienced retained counsel. They discussed the confessions of his two accomplices, his prior felony record, the Habitual Criminal Act, the length of the sentence he could receive and the parole possibilities under a charge of "Burglary with Explosives" and under the Habitual Criminal Act, the statements of the District Attorney concerning the circumstances under which the Habitual Criminal Act would be invoked, and the propensities of the sentencing Judge. In my view, the defendant's plea was made freely, voluntarily and intelligently.

Barber's prayer for relief is denied.