STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. VICTOR R. FUNICELLO, DEFENDANT-APPELLANT.

Argued February 6, 1967—Decided July 19, 1967.

554

556

Mr. *James T. Clare* argued the cause for defendant-appellant.

*Mr. George A. Franconero,* Assistant County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J. The Essex County Grand Jury returned an indictment against the defendant Victor R. Funicello charging that on April 5, 1965 he murdered Fred Palmarozza in the City of Newark. At his trial before a jury, which began on January 5 and ended on January 31, 1966, the State sought the death penalty. At the conclusion of the testimony and the summations of defense counsel and the assistant prosecutor, the trial judge delivered a thorough charge which contained a fair and comprehensive review of the facts as well as a precise outline of the legal issues to be determined by the jury. The jury was advised as to the verdicts which could be reached depending upon the conclusions reached on the evidence. The verdicts were: (1) not guilty; (2) first degree murder, either as (a) felony murder, *i. e.,* the killing occurred during the course of a robbery; or (b) murder which was premeditated, deliberate and willful, and in connection with the two types of first degree murder, the further instruction was given that if guilt of either one of them was found, the jury should decide whether to recommend life imprisonment, and the jurors were told that if such a recommendation were not made the defendant would suffer death; (3) second degree murder; and (4) manslaughter. In addition the court submitted to the jury with consent of counsel a memorandum listing the possible verdicts, with the suggestion that upon reaching a verdict a check be placed alongside the offense of which guilt was found or alongside not guilty, if that was the conclusion. The jury returned a unanimous verdict of guilt of felony murder without a recommendation of life imprisonment. Thereupon, the defendant was sentenced to death. Direct appeal to this Court followed. *R. R.* 1:2–1(*c*). Certain trial errors are alleged as a basis for reversal, the primary one being that defendant's

oral and written confessions were involuntary and should not have been received in evidence. In our judgment the confessions were properly admitted, the defendant received a scrupulously fair trial, and the evidence overwhelmingly supports the jury finding of guilt of first degree murder.

I

Fred Palmarozza, age 60 years at the time of his death, operated a used car lot under the name of Palmer Motors at 687 South 14th Street in the City of Newark, N. J. There was a small frame structure on the lot which was used as an office. It contained a desk, chairs, a couch, a television, telephone, and other incidental equipment and articles.

On April 6, 1965 at about 9:30 A. M., Otto Weil, a business associate of Palmarozza's, came to the office on the used car lot. The door was open a little and he went in and saw the body of Palmarozza in the right rear corner of the room. It was in a pool of blood and in a partially sitting position propped against the wall with the left arm resting on a chair. He called the police immediately, and after they arrived he noticed that a 1963 Ford two-door hardtop was missing from the lot. Four Newark police officers responded within a few minutes; one of them called the Homicide Squad and shortly thereafter Lieutenant Kinney, Sergeant Buerle and Detective Leonardis of that squad arrived. A series of photographs were taken and the body was removed to the morgue. In looking around the office, Sergeant Buerle found an order book showing that on March 30, 1965 Victor Funicello had made a five-dollar deposit on the missing Ford. The book showed the purchase price as $1,600, and contained a further notation "V. F. 4-8-65." Buerle also found a copy of a receipt written on the back of a piece of carbon paper. It was dated April 5 and referred to a 1963 two-door Ford, giving the serial number. The price $1,600 also appeared with the notation "paid in full," followed by Palmarozza's signature, and farther down, the signature of Funicello. One

of the officers discovered in the waste basket an incomplete application for passenger vehicle registration bearing the name Victor R. Funicello. A five-dollar bill was picked up, but no other "real money" was located.

At 2 P. M. April 6, the County Physician, Dr. Edwin H. Albano, performed an autopsy. It revealed that the victim had suffered 11 stab wounds, 24 cutting wounds, and one lacerated wound. The wounds were scattered over a wide area of the body. There were eight cutting wounds of the scalp distributed over the left side of the head, one on the right side of the forehead, one on the right side of the face, a stab wound four inches in depth on the right side of the neck, as well as a cutting wound on that side of the neck, another stab wound almost as deep on the left side of the neck, a stab wound of the right side of the face, 2½ inches deep, a cutting wound in front of the right ear, and below the right jaw, a stab wound of the right flank which entered the abdominal cavity, another on the outer aspect of the right thigh, and two more on the outer aspect of the right leg. There was a stab wound 4½ inches deep of the left chest which perforated the outer wall of the left side of the heart; two more deep stab wounds of the right chest which penetrated the lung were found. Death was caused by the stab wounds of both sides of the chest, the neck and the abdomen, with hemorrhage into both chest cavities and into the sacs surrounding the heart. One wound which would have caused immediate death was the one in the left side of the chest which perforated the lateral wall of the heart. From the nature, location and direction of the wounds it was the doctor's opinion that they probably had been inflicted by a person who was left-handed. It appeared later that the defendant is left-handed.

Some of the wounds the doctor found he described as "defense wounds." They were a cutting wound of the web between the index and middle fingers of the right hand, another of the palm of that hand just below the thumb, a third on its palmar aspect, a fourth through a joint of the fourth

finger, a part of the bony structure protruding through the wound opening, and fifth, a cutting wound on the outer aspect of the right arm. Experience had shown that such types of wounds are inflicted while the victim is trying to defend himself. Specific reference is made to these multiple knife wounds to indicate that Palmarozza did not easily give up his life. In this connection it may be noted also that there were gross marks of spattered blood on the walls and particularly on the floor of the victim's office, indicative of a struggle that took place there.

At about 3 A. M. on April 6, Funicello, then 24 years of age, appeared at the home of Mrs. Estelle Lichen in Jackson Township, Ocean County, New Jersey. Mrs. Lichen and her family, particularly her daughter Michelle, had been friends of his for 11 or 12 years. Funicello was fond of fishing and frequently came to the Lichen home very early in the morning. So Mrs. Lichen admitted him and told him he could sleep upstairs in the room of one of her sons. Early the following morning, he told her and her daughter that he was in trouble. Specifically he said he had made a five-dollar deposit on a 1963 Ford car he intended to buy from Palmer Motors. The price was $1,600, and on the previous day while alone and on the way to complete the transaction he stopped at the Clinton Diner where he met a man he knew only as Tony. He did not know Tony's last name nor where he lived. He told Tony about the impending car purchase and asked if he wanted to go along. Tony agreed and they drove to the lot, where Funicello gave the seller the $1,600. After the seller had made out the bill of sale and a receipt for the money, Tony put the office light out and started to stab Palmarozza. Funicello tried to stop the stabbing and succeeded finally in wresting the knife from Tony, cutting one of the fingers of his left hand in doing so. Funicello said he "panicked" then, ran out, got in the Ford car (which had Palmarozza's dealer registration plates on it) and drove away, eventually reaching the Lichen home. He said also that at some time during the

fracas Tony had taken the $1,600 from the office desk; he did not say just when or how he saw it in the dark.

Funicello told the Lichens that he had gotten sick because of the sight of the stabbing and had vomited on his clothes. So he asked Mrs. Lichen to wash his shirt and trousers. She did so during the course of the day, using the washing machine, but denied at the trial that she saw any blood on them. She said she smelled vomitus but saw no evidence of it. Funicello asked the Lichens also to buy him a shirt, trousers, a pair of socks and shoes when they went shopping, and gave them $20 for the purpose. The daughter made these purchases. While they were out Funicello drove the Ford car, which had been parked in the street, into the Lichens' garage.

Funicello remained there on April 6 and until 10:30 or 11 P. M. on April 7. They read in the paper about the murder and the story indicated the police were looking for the 1963 Ford car. Discussion ensued about his reporting to the police. Although he had shown Michelle Lichen the bill of sale for the car, she testified that he was nervous about the car and decided to abandon it somewhere. About 11 P. M. on April 6 he drove the car to Freehold, removed the ignition keys and abandoned it on a side street, where a Freehold police officer found it at 5:00 the next morning. Michelle followed him in her car and drove him back to her mother's home. It appeared later that on the way back Funicello threw the ignition keys away; also that he tore up the bill of sale and the receipt for the $1,600 payment, and flushed them down the Lichens' toilet. The following day he told the Lichens he wanted to go to the police, explain the matter to them and get it straightened out. That evening both the Lichens and Funicello drove to the Neptune Police Headquarters, arriving there at 11:20 P. M., and he advised the officer in charge of the nature of his mission. Two teletype bulletins had gone out from the Newark police, the first one concerning the missing car and the second indicating that Funicello was wanted for questioning in a homicide investigation. The Neptune officer telephoned the Newark Department and was told that some officers were

already in Monmouth County to pick up another person for questioning, and that they would be dispatched to Neptune. Four Newark detectives, Buerle, Inneo, Leonardis and Dell'-Ermo, arrived there at about midnight and talked briefly with Funicello, who repeated that he wanted to get the matter straightened out. He was asked if he wanted to come back to Newark and talk about it there, and agreed to do so. They drove back to Newark, arriving there about 1:30 A. M. In the car during the ride was Philip Gartner, age 16, a friend of Funicello's whose name had come up in the investigation and who was visiting his grandfather in Wall Township at the time. After Funicello turned himself in at Neptune, Mrs. Lichen telephoned his home in Edison, N. J. and advised his sister that he had done so.

On arrival at Newark Police Headquarters, some preliminary formalities were attended to and then Funicello was taken to the interrogation room. There he was questioned principally by Sergeant Buerle and Lieutenant Kinney, head of the Homicide Squad. Other detectives were in and out of the room during this period; Detective DeStefano of the prosecutor's staff appeared about 3 A. M. At first Funicello repeated the "Tony" version of the killing, with some variations from his statements to the Lichens. In about an hour, i. e., about 3 A. M., after the officers had endeavored unsuccessfully to obtain more specific information about Tony and told him they did not believe his story, he said he would tell them the truth. Sergeant Buerle then began to make notes of the oral admissions.

In substance Funicello told them that he was unemployed; that he had talked to Palmarozza about buying the 1963 Ford he had seen on the used car lot, and had made a five-dollar deposit on the price of $1,600 which he did not have. On April 5, 1965, he visited Palmarozza's office and arranged to meet him at 10 P. M. at a nearby Esso gasoline station where a friend of his, David Ferguson, worked. Palmarozza appeared there driving the Ford, which bore dealer's plates.

Palmarozza agreed to go for a ride with Funicello driving. They left the station and drove to the Clinton Diner in Irvington. After a short stay there they drove to the office at the used car lot. Palmarozza sat at his desk and according to Funicello he talked about "queers" for about 15 minutes. One or more of the detectives said that at one point in the oral statement, Funicello asserted Palmarozza had "grabbed for his privates," which enraged him. (At the trial Funicello denied that this happened or that he said it did to the detectives. The incident does not appear in the written confession, although a reference to the discussion about "queers" is included.) Palmarozza made out a bill of sale for the car, and a receipt identifying it and showing payment of the full purchase price. After the receipt had been signed, Funicello hit Palmarozza in the head with his left fist. As Palmarozza stood up Funicello drew a dagger-type knife and stabbed him twice in the stomach area. Palmarozza pushed him and again he stabbed him in the same area, whereupon the wounded man went toward the office couch, at which Funicello put the light out, closed the door and drove away in the Ford. Then he told how he went down to the Lichen home and remained there until turning himself in to the Neptune police.

In this oral confession he told of asking Mrs. Lichen to wash his clothes because he had noticed there were blood stains on the left knee of his trousers. And he said he explained to the Lichens that the cut and swollen left hand he had received in the course of the killing came about in his effort to prevent Tony from stabbing Palmarozza. Further he said that when he drove the Ford into the Lichen garage, while Mrs. Lichen and Michelle were out shopping, he threw the knife he had used in the killing into a corner of the garage. Funicello, who insisted the Lichens were in no way involved, asked if he could write a note to Michelle, and he was permitted to do so. The note, which was in his own handwriting, follows:

"Miki please tell the police everything I told you and your mother tell then that I gave you $20.00 to buy the clothes and tell then that you wash my clothes ther is a knife in the garage which I didn't tell you about tell then that you and your mother held me move the car. please don't worry about anything I sorry about any trouble I gave you and your mother."

The oral confession was finished at 4:40 A. M., April 8. Apparently it was the intention of the officers to reduce it to writing. Funicello said he was tired and needed some rest. The questioning then ceased and he was removed to a cell. At 9:40 A. M. he was brought back to the interrogation room, where he agreed to give a written statement. The questioning began at 9:45 and the typed, single-spaced confession in question and answer form, covering four and three-quarters pages, was completed at 12:33 P. M.

In accordance with the established practice, a preliminary hearing as to the admissibility of the oral and written confessions was conducted by the court. *State v. Smith,* 32 *N. J.* 501, 557–560 (1960), *certiorari* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961); *State v. Jackson,* 43 *N. J.* 148, 166–167 (1964); *State v. Wolf,* 44 *N. J.* 176, 193–194 (1965); *State v. Billingsley,* 46 *N. J.* 219, 232 (1966). It was held out of the presence of the jury. Defendant objected to their introduction in evidence on the ground that the State had failed to establish that they were voluntarily given. The trial court, after an exhaustive review of the facts, found that the State had proven their voluntariness beyond a reasonable doubt, and admitted them. See *State v. Yough,* 49 *N. J.* 587 (1967). As has been indicated, defendant challenges that finding, and we shall deal more fully with the issue hereinafter.

On the basis of the note to Miss Lichen and the confession of Funicello, the State obtained from the Ocean County Court a warrant to search the Lichen premises. A search was made there on the afternoon of April 8. A hunting knife, later identified as the defendant's, was located in the garage in the area described by Funicello, and a shirt, a blood-

stained pair of trousers and a blood-stained black jacket (admittedly the defendant's) were found in the house. They were seized and introduced in evidence at the trial. An expert chemist and toxicologist examined the articles of clothing and testified for the State. The black zipper, outer jacket, which had not been laundered, was widely stained with type "O" blood, the decedent's type of blood. There was tissue staining as well as the blood on the jacket, indicating a rubbing off of Palmarozza's skin through contact with it. Even though the trousers had been laundered, blood stains were found just below the right knee. The type could not be ascertained due to the laundering. No trace of vomitus was found on any of the clothes.

This expert witness also examined the sport jacket and trousers the decedent had worn when attacked. He testified that in addition to multiple knife cuts, the right pocket of the jacket and the left leg of the trousers were torn.

On this appeal defendant argues that the knife and articles of clothing seized were the fruits of the illegally extracted confessions and note, and should have been excluded at the trial upon his objection.

One of the three final questions, just above defendant's signature on the written confession, asked if there was anything he wanted to add thereto. He answered, "No, Sir. I just want to say that Philip and Dave and my girl friend and her mother are not involved and had nothing to do with it." The Philip referred to is Philip Gartner, the 16-year old young man who was picked up in Wall Township and rode back to Newark with defendant and the police on the night Funicello turned himself in. Dave is David Ferguson, who was employed at the Esso gasoline station where Funicello met Palmarozza on the evening of the homicide. Gartner had known the defendant and been friendly with him for about two years; Ferguson, who was married and had two children, had been a fairly close friend for about seven years. Both men testified for the State.

Ferguson testified that on Saturday, April 3, 1965, Funicello sold his 1954 Cadillac for $75. This is a conceded fact in the case. When the transaction was completed, Funicello removed the registration plates as well as a .32 caliber revolver, a hunting knife and other articles from the Cadillac and put them in Ferguson's car.

Some time prior to April 5, Funicello said he was going to buy a 1962 to 1963 Ford from Palmer Motors, and had placed a five-dollar deposit on it. Knowing defendant was unemployed, Ferguson asked him if he had any money to which he replied that he had none but he would get the car "no matter what." On one occasion during the week before April 5 in the course of conversation, Ferguson testified Funicello said he was going to go into Palmarozza's, "hold a gun on him, make him sign the bill of sale over and then he'd take him down and bury him down Island Beach;" he said it would have to be during the week because too many people were there on week-ends.

Around noon on April 5, Funicello borrowed Ferguson's car to drive to his home in Edison, N. J. Philip Gartner accompanied him. According to Ferguson, Funicello's hunting knife was in the ashtray of the car. Gartner saw it there during the ride to and from Edison, and described it as about 12 inches long. When they arrived at defendant's home he removed the .32 caliber revolver from the front side panel of the car and brought it into the house. Gartner testified that while they were riding back to Newark, Funicello told him that he was going to buy the Ford car he had previously pointed out on the used car lot, "that he liked that car a lot and that he was going to get that car, and that he would make the man sign the bill of sale for it so it would be in his name"; "he said that he would hold the man up." He told Gartner if he wanted a car he would get him one too, but Gartner told him "I don't want nothing to do with it." Gartner went to the shore with his grandfather on the evening of April 5, and was there when the police officers came to see him.

When Funicello and Gartner got back to the Esso station, according to Ferguson, the hunting knife was still in the ashtray, and was there as late as 7:30 P. M. Later in the evening defendant came back to the station, told Ferguson he had an appointment there with Palmarozza at 10 P. M., that he was tired, and asked if he could take a nap in Ferguson's car. Ferguson having no objection, defendant got in the car, after asking to be awakened by 10 P. M. At 10 P. M. Palmarozza arrived driving the 1963 Ford, and after Funicello had paid for some gasoline they left together, defendant driving. Around 11 P. M. when Ferguson went to his car, the hunting knife was no longer in the ashtray. While on the witness stand he identified the knife that had been located in the Lichens' garage as owned by the defendant and the one that had been in his car. In Funicello's oral confession he admitted taking the knife from Ferguson's car before getting in the Ford car with Palmarozza.

Funicello testified in his own defense. He conceded his friendship with Ferguson and Gartner. In fact he had been fishing with Ferguson at Island Beach on the Saturday before April 5. He agreed generally with their statements about his actvities on April 5, but he denied ever saying to either one of them that he would hold up or kill Palmarozza to get the Ford car. In this connection, it may be noted that when questioned in his written confession as to whether he ever talked to anyone about killing Palmarozza he said: "Yes, in a kidding way I told Dave Ferguson and Philip Gartner that I was going to kill Fred to take the car." Further he denied that the knife the police recovered in the Lichen garage belonged to him. He owned one "something like it," but the one used in the stabbing was not his. Moreover, he denied he had transferred his knife or the .32 caliber revolver to the Ferguson car when the Cadillac was sold. The gun belonged to his father, and defendant had loaned it to Ferguson about two weeks before April 5. On the way down to Island Beach the previous Saturday, Ferguson told him it was in the car. With respect to the murder knife, he declared he never saw it in the

ashtray of the Ferguson car when he drove down to Edison and back, or when he was in the car later in the day to have a nap, and he denied taking a knife from the ashtray.

In describing the events leading up to the killing, he said that he talked with Palmarozza around 8 P. M. on April 5 about completing the sale of the Ford, and told him he would have to go to his home in Edison to pick up the $1,600 needed for the payment. They agreed to meet at the Esso station at 10 P. M. and go to Edison together in the Ford for the money. Palmarozza appeared at the agreed time and they started out with Funicello driving. On the way they stopped at the Clinton Diner in Irvington. As they sat at the counter he saw in a nearby booth a man known to him only as "Tony," whom he had met with Ferguson. Defendant did not know his last name or where he lived, although he thought Ferguson had said it was downtown Newark somewhere. He had seen Tony a few times in the neighborhood of the Esso station, just hanging around. He believed Tony was a "junkie" because he saw him with people he thought were narcotic addicts. Funicello said he went to the men's room and on the way stopped to talk to Tony. During the conversation he told him of the impending purchase that night of the Ford for $1,600. He did not tell Tony where the used car lot was located. Tony asked for a lift to a gas station, without naming it or saying where it was. Defendant said he was unable to accommodate him because he was on the way to Edison to get the $1,600. Then when Funicello came out of the men's room Tony was gone.

Defendant and Palmarozza drove to Edison, and on reaching his home he went into the house for the money. Palmarozza remained in the car. He took about $1,480 or $1,500 out of a little leather box in his room. He had $275 or $300 on his person so when he returned to the car he had "close to $1,800, around $1,750," in an outside flap pocket of his black zipper jacket. Although he had no job at the time, this money had been accumulated from various activities in the past.

They drove back to the 'used car lot and went into Palmarozza's office. The Ford was left in the lot with the keys in it. After some discussion the bill of sale was made out and a receipt for the $1,600 prepared and signed. The money was passed and the seller gave him an application for registration plates which he partially completed. About this time Tony walked in and sat on the couch. After a brief period during which he said nothing, he stood up, put the office light out and began to hit Palmarozza; then he had a knife and began to stab him. Funicello tried to stop him and in the struggle received a cut on his left hand. But he was able to wrest the knife from Tony and he ran outside with it in his hand. Once outside he "panicked," got in the Ford and drove away, taking the knife with him.

In his testimony he described the visit to the Lichen home substantially as they related it. He gave them his version of the killing, and conceded he had asked to have his shirt, trousers and socks washed, although he saw no blood on them. He gave them $20 to buy some new things for him and while they were out shopping he took the Ford off the street and put it in the garage. The knife was still in it. He wiped off the blood and tried to break the blade, but only succeeded in bending it. Then he threw the knife in a rear corner of the garage.

That night, because he was "scared," he abandoned the car in Freehold, threw the keys away and tore up the bill of sale and the $1,600 receipt in the fashion already described. Finaly, after reading newspaper accounts of the murder, and being importuned by Mrs. and Miss Lichen to do so, he decided to go to the police. He did this, he said, because he "couldn't think or eat or do nothing." He "wanted to tell" what had happened. He "wanted to talk to some police officers." Why he selected 11 o'clock at night to go to the Neptune police, rather than the following morning, was not explained. The subsequent activities concerning the appearance of the Newark Police, the return to headquarters there, and the beginning of the interrogation which led to the oral

confession about an hour thereafter have been detailed above. Funicello claims both the oral and written confessions were extracted from him by force and without any advice as to his constitutional rights.

## II

Before the Newark police officers went to Neptune Township, David Ferguson had already been interviewed. There can be no doubt that as the result of his statements and the documentary evidence acquired at the used car lot office, Funicello was a prime suspect. Although he had presented himself voluntarily in order to make a statement about the killing, and willingly accompanied the officers back to Newark, it is clear that once at police headquarters he was under arrest for investigation of murder.

Funicello was brought into the interrogation room between 1:30 and 1:45 A. M. The officers present were Lieutenant Kinney, Sergeant Buerle and Detective Leonardis. Detectives Dell'Ermo and Inneo were in and out of the room at intervals. Before the questioning began Buerle advised Funicello that he did not have to answer any questions, that he had the right to remain silent, and that anything he might say could be used against him; also that he could have a lawyer if he wanted one, to which he replied that he wanted to tell "about this thing." He was asked whether he understood what Buerle had told him and replied in the affirmative, saying that he wanted "to straighten this thing out." Buerle testified also that at no time during the questioning and oral and written statement-taking did defendant request an attorney or indicate in any way that he wanted one; nor did he ask permission to make a telephone call to his father or any member of his family from the time he was picked up in Neptune Township throughout the period of statement-taking. In fact he said affirmatively that he did not want to talk to anybody about it, he did not want his family "to know about this;" and Sergeant Buerle was positive that Funicello told them he did not want to talk to his father.

Buerle denied that he or any other officer made any promises to the defendant in return for a statement, or threatened him in any way. Specifically, on cross-examination he denied that he or any other officer punched or kicked Funicello, or hit him about the body with a telephone book or a large ledger 14″ by 6″ or 8″ and 1½″ to 2″ thick, which was kept in the interrogation room, or that defendant's face or eyes were swollen when the written confession was completed. He did have a swollen and cut left hand and a bruise or cut or scratch on one leg, which no one claimed were chargeable to the officers. Detective William J. Leonardis corroborated Buerle as to the advice given Funicello respecting his right to silence and to an attorney, and that anything he said "would" be used against him. And Leonardis testified that in answer defendant said he did not want to see anybody. This witness also denied that any one had threatened or struck Funicello in any way during the questioning; or that at any time had defendant asked to call an attorney or to see an attorney or to call any member of his family. Around 1 p. m. the next day after the written confession had been signed, Leonardis saw defendant's father and mother at headquarters. He told defendant they were there, but Funicello said he did not want to see them. Leonardis repeated "It's your father and mother," but defendant said: "I don't want to see them; I don't want to see anybody." Leonardis went out, brought the parents in anyway, and left them with their son for some time.

Lieutenant Joseph Kinney, who had charge of the Homicide Squad, was present at the questioning. His recollection was not certain as to whether he or Buerle had given the preliminary advice to Funicello regarding his rights. It seems plain from the testimony of the other officers involved that Buerle had given the first cautionary advice, and the trial judge in making his findings as to the voluntariness of the confession declared that "before taking any oral statement from the defendant" Buerle had warned him that "anything he might say could be used against him." Kinney indicated he told the defendant that anything he said could be used "for or

against him." Six months after this case was tried, we indicated our disapproval of so much of that type of warning as suggested that anything he said could be used "for" an accused. *State v. Cook*, 47 *N. J.* 402, 417, *fn.* 7 (1966); *cf. State v. Roesel*, 62 *N. J. L.* 216 (*E. & A.* 1898). We assume that such phrase is no longer in use. In any event, in this case, having in mind all of the circumstances, particularly the unqualified oral warnings given by others as well as the unqualified written one which was explained to defendant by Kinney and which was contained in the preamble of the written confession beneath which defendant affixed his signature, we agree that Kinney's language played no significant or prejudicial part in the production of the oral or written confessions.

With respect to the right to consult or obtain an attorney before or during the questioning, Kinney said three times during his testimony that defendant was told he had a right to counsel and a right to use the telephone; also that he had called defendant's attention to the statement in the preamble to the written confession that he had "the right to consult an attorney prior" to the making of the statement. At another point in his testimony he said the reference to an attorney was "in the event he was directly involved if he wanted to consult with a lawyer or make any phone calls he had the right. He said he would answer our questions."

Defense counsel seizes upon that statement as the basis for an argument that it left defendant in a position where if he requested counsel he would inferentially concede that he was "directly" involved. But defendant did not say so when he testified either in or out of the presence of the jury as to the claimed involuntariness of his confessions. Moreover, as has been shown, he was advised unqualifiedly a number of times that he had the right to counsel if he wanted one; the trial court so found. In addition, when prosecutor's detective DeStefano appeared on the scene at about 3 A. M. he asked defendant "if he wanted a lawyer" and defendant said, "They already asked me if I wanted one and I said no." We feel,

as undoubtedly did the trial court, that the ambiguous statement of Kinney was swallowed up in the mass of unambiguous advice as to the right to an attorney, and had no meaningful influence upon either Funicello's failure to request counsel, or his positive answer to DeStefano that he did not want an attorney.

Leonardis, Kinney, Dell'Ermo and Inneo all asserted there were no promises or threats of any kind to induce Funicello to confess. Also, they emphatically denied he had been beaten or mistreated in any way before he confessed, or that his face and eyes or any part of his body had been injured or bruised as a result of beating or kicking by them. And prosecutor's detective DeStefano testified that on his arrival there were no signs whatever that Funicello had been beaten.

The trial court was satisfied, as are we, that the oral confession, which began about an hour after the first questioning, came from the defendant voluntarily when he realized his original version of innocent participation in the killing was incredible. There is no doubt he first told the officers the "Tony" story. But when they inquired as to why he had tried to break the fatal knife, and then threw it away, why he had destroyed the bill of sale and the receipt showing his payment of $1,600 for the car, why he had abandoned the car and thrown the keys away, when such things offered the only possible support for his version of the happening, undoubtedly he knew his statement that all of these acts, so inconsistent with a claim of innocence, were done because he was "scared," lacked credibility. And when the questions revealed how incredibly little he knew about the evanescent "Tony," and how unlikely it was that any such person would or could have appeared at the used car lot office, the total unreality of his explanation plus the detectives' comments that they did not believe him motivated his urge for the disclosure he then made.

As has been noted above, the oral confession began at about 3 A. M. with Buerle taking notes. It was concluded at 4:40, after defendant wrote the note to Michelle Lichen.

Further questioning was abandoned because he said he was tired. He was fingerprinted, two routine photographs of his full and side face were taken, and he was placed in a cell. At 9:38 A. M. he was returned to the interrogation room. Lieutenant Kinney and Detective Leonardis were present. There he agreed to give a written statement. Before the question-and-answer typing commenced, the preamble on the form was read to him and it was given to him to read. It said:

"I, Victor R. Funicello hereby make the following free and voluntary statement to Lieut. Joseph Kinney who has identified himself to me as a member of the Police Department, City of Newark, County of Essex, New Jersey.

I have been advised by Det. William Leonardis that I do not have to make any statement and that anything I may say may be used against me in a court of law. I know that I have the right to consult an attorney prior to my making a statement and do not wish to do so. No threats, promises or offers of reward have been made to me to induce this statement."

Funicello signed it at the bottom and his signature was witnessed by Lieutenant Kinney. The confession then proceeded in question and answer form with Kinney doing the typing. Its 4½ pages were completed, read to the defendant and given to him to read, after which the following questions and answers were added:

"Q. Det. Leonardis read this statement to you, is that correct?
A. Yes.
Q. Is there anything that you want to add to this statement?
A. No, Sir. I just want to say that Philip and Dave and my girl friend and her mother had nothing to do with it.
Q. Is this statement the truth?
A. Yes.
Q. Are there any corrections you want to make?
A. No sir."

Funicello signed and swore to the contents, Kinney witnessing the signature and administering the oath. The matter was concluded at 12:33 P. M.

Defendant was taken to Dr. Paul A. O'Connor, the police surgeon, for examination. The doctor had him remove all his clothes for the purpose. The examination revealed a contusion and abrasion on the knuckle of the index finger of defendant's left hand, and a laceration of the flexor crease of the third and fourth fingers. He found also an eight-inch by six-inch abrasion and contusion on the right side of Funicello's chest, and a six-inch by two-inch abrasion on the left shoulder. On inquiry defendant said he had received the injuries in a fall down the stairs at the Lichen home. In our view, on the evidence the trier of the facts might very well have found that these body bruises resulted from the struggle with Palmarozza in the used car lot office. The doctor said they could have been two or three days old. Defendant made no claim to him that they came from beating by the police officers. Except for these bruises and the left-hand injury, defendant was in a normal physical condition and fully oriented mentally. The doctor found no swelling or signs of injury to his face, head, eyes or ears.

Funicello was returned to the interrogation room about 1:15 P. M., and it was at this time that Detective Leonardis brought defendant's parents in to see him. When they left, an attorney, Paul Policastro, Esq., who entered the case at the behest of the parents some time earlier that day, appeared and Leonardis brought him in to see defendant. There is no evidence whatever that Mr. Policastro asked to see his client before that time. He remained in the room talking with defendant for about a half hour. Shortly thereafter, Funicello was taken before a municipal magistrate for preliminary examination. Mr. Policastro appeared there with him; they faced the court together, and the record is barren of any suggestion that the court or counsel commented about any swelling of defendant's face or ears or that he had two black eyes. Upon completion of the proceedings, defendant was returned to his cell at police headquarters.

The record of the jail shows that Funicello was admitted to the Newark Street Jail on April 9, 1965 at 6:16 P. M. On ad-

mission, Joseph L. Austin, a correction officer assigned there, had him strip for examination in accordance with the routine practice. Austin saw a cut on one finger and some bruises on the upper part of his body. He noted them on the medical card he was required to complete and sign. On inquiry as to how the bruises were received, Funicello said he fell down a flight of stairs. He made no claim of beating by police; nor did he claim any injuries to his head or face. If any had been apparent, Austin would have noted them on the card. In addition to the bruises mentioned, Austin said defendant looked "very tired" to him, and he noted that Funicello appeared to be ill. However, in answer to the specific question on the card, "Are you now sick," Funicello said "No," and signed the card. Prisoners are allowed to go on sick call at 8 A. M. each morning. The State produced Gerald Rettenberg, the jail nurse, who said he had examined all the medical and sick call records and found no record of any claim of illness or request for treatment, or complaints of any kind by Funicello.

The defendant's account of the circumstances attending the giving of the confessions is in sharp contrast with that of the detectives. He testified that before leaving the Neptune Township police headquarters he asked if he could telephone his father, and the Newark officers said he could do so when they reached their headquarters. (As noted above, within an hour or so after he had turned himself in, the Lichens notified his family by telephone.) On arrival at Newark he said he asked for a lawyer, and renewed his request to telephone his father so a lawyer could be obtained for him, but the officers refused, saying he would have to give them a statement first. He denied that he was told he had the right to remain silent, that anything he said could be used against him or that he could have an attorney if he wished or that he could use the telephone. Further, he denied saying he did not want to see his parents or anyone.

At the outset of the questioning he related the "Tony" version of the killing. They insisted he was lying. When he persisted in holding to that account, they began to beat him.

They took turns "smacking" him. One officer who was standing behind him hit him in the back of the neck and knocked him off the chair to the floor. While he was there they kicked him in the stomach and ribs. He was put back in the chair and handcuffed with his hands behind him. (The officers denied he was handcuffed at any time during the questioning). Buerle said he did not believe him and kept striking him; Leonardis kicked him "once in a while" in the stomach and ribs. He was told that if he did not sign a statement admitting the killing he would be thrown out the window. When he did not comply he was punched in the face, eyes and ears, knocked off the chair again and kicked while on the floor. Lieutenant Kinney struck him with a large heavy ledger in the head and stomach; a telephone book with a board in it may have been used the same way. One officer gave him a cigarette, and then pushed it in his face, burning his lip. He was told they would continue beating him if he did not sign the statement they had already prepared, and in addition they would arrest Michelle Lichen and charge her with crime.

Funicello testified that after three hours of beating, he said he would sign anything they wanted, and he did sign the statement which they presented to him already typewritten. It was not prepared by questioning him in the room where they were. He thought he signed it in three or four places, but he did not read the statement. When he signed, it was "getting light." The entire questioning and signing of the statement was one continuous episode. He denied saying he was hungry or tired and wanted to rest after making oral admissions. He denied that he was taken from the interrogation room, fingerprinted and photographed and put in a cell around 5 A. M. and brought back to the interrogation room about 9:30 A. M. for further questioning and the making and signing of the written confession. He asserted that after signing the written statement, which was close to daylight because it was getting light, he was fingerprinted and photographed and put in a cell. The fol-

lowing morning he was taken from the cell to be examined by the doctor, and instructed to tell the doctor that he had fallen down the stairs; if he did not comply they would beat him again, throw him out the window, and lock up his girl friend. Although the statement records that it was begun at 9:40 A.M. and completed at 12:33 P. M., April 8, he refused to admit that the times noted were correct.

Although he told the doctor and other persons that he had fallen down stairs at the Lichen home, he did so, he said, because he was afraid of the threatened police action. He denied he had such a fall or that his bruises came about that way; he conceded, however, that he had never told anyone except his attorney and the defense investigator that the police had beaten or mistreated him.

After Dr. O'Connor's examination, Funicello was returned to the cell until shortly before his appearance in the municipal court. He talked with his attorney Mr. Policastro before the preliminary court proceedings and was represented by him there. Mr. Policastro did not appear as a witness at the trial of the indictment.

Defendant's father, mother and sister testified in support of his claim of beating by the police officers. The father said he had been notified, he thought, by the Neptune police of his son's arrest. So he and his wife went to Newark Police Headquarters around 9 A. M. on April 8, and he asked at the information desk if he could see his son. He was told to have a seat, but after waiting until around 10 A. M. he left and went to the City Hall to seek some help. Through the intercession of someone there contact was made with Mr. Policastro, who met him sometime later, apparently shortly before the municipal court proceeding. There is no suggestion that Mr. Policastro requested and was denied permission to see the defendant. Nor is there any specific denial of Detective Leonardis' testimony that on meeting Mr. Policastro at headquarters, after the written confession had been taken, he brought him to Funicello and left them together for about a half hour before the court session.

Funicello, Sr. said that when his son appeared in court he looked as though he had been beaten by 20 men; his face was swollen, his eyes were blackened, his nose was distorted as if broken, his ears were puffed out, almost sticking straight out from his head. Later, when he had a chance to inquire about the source of the injuries, defendant told him he had fallen down the steps at police headquarters; he said also that the police had not beaten him.

Defendant's mother and sister testified they were not allowed to visit him around 9 A. M. on April 8. When they did see him in court they observed the same facial condition as had Funicello, Sr.

Aside from the testimony of the detectives, Dr. O'Connor, and the Newark Street Jail officer that no such facial injuries existed, there was other convincing proof of that fact. The State put in evidence the facial photographs that even Funicello said were taken after the alleged beatings. They show no sign of black eyes, swollen nose or face, or of any other injury.

Two State prison inmates testified for Funicello. They were both in Newark Street Jail awaiting trial when defendant was admitted there on April 9. Theodore Gibson was later convicted of illegal sale of narcotics; William Nolan was later convicted of illegal entry; he had been convicted previously of autolarceny and escape from the reformatory. Gibson said he saw Funicello in the walkway of the tier where his cell was also located. Defendant was walking in a bent-over fashion, then Gibson saw him down on one knee and he went over and asked if Funicello wanted him to call the guard. Defendant declined, saying he was alright, but then fell over on his side, and on further inquiry told Gibson his stomach was bothering him. Gibson said he unbuttoned Funicello's shirt and saw that his stomach was all "messed up," black and blue, mainly on the right side; the right side of his face was swollen also, and he was pale. Gibson did not say he saw two black eyes, swollen nose and puffed ears "sticking out" from his head as Funicello's father, mother and sister had alleged. He testified that he called the guard and asked

if defendant was "sick," saying nothing about the black and blue stomach. The guard then gave Gibson some aspirin for defendant. And according to Gibson's recollection defendant was on nurse call a few days later. But as the nurse testified, the daily records do not confirm that fact and he has no recollection of treating or aiding Funicello. Moreover, defendant made no assertion that he was ever on sick call at the jail. Although the two men talked together on at least two occasions before Gibson was tried and sent to State prison in June 1965, he never asked where the bruises he saw came from, nor did Funicello ever tell him they were the result of police brutality.

Nolan said he also was on the same cell tier when Funicello was first brought in. As he went down the walkway he saw defendant lying on the bed in his cell wearing a light-colored T-shirt. He stopped to talk and noticed that Funicello seemed "shaken up" and the right side of his face and his eyes were swollen. They were not black and blue. The next day they were in the shower together, and he noticed bruises around the defendant's stomach and ribs. Funicello remained on the tier with Nolan and Gibson for a few weeks before he was moved. During that time the three men conversed; they talked about the charges against them and the law; they played dominoes; and Nolan and Gibson knew the charge against their tier mate was murder. Yet Funicello never told either of them that he had been beaten by the police.

After hearing argument on the subject out of the presence of the jury, the trial judge held that the oral and written confessions were voluntary and would be admitted in evidence. In doing so, he made lengthy and detailed factual findings in support of his conclusion. He found that before the questioning began adequate warnings had been given by the police officers to Funicello about his right to be silent, that anything he might say would be used against him, and that he was entitled to an attorney, if he wanted one. More specifically he found that defendant did not wish to see anyone, including his father, that he was not denied permission to make a tele-

phone call, and that defendant not only did not request an attorney, but said affirmatively that he did not want an attorney, and wanted to make his statement. The claim of an unduly lengthy interrogation was rejected, as well as the suggestion that defendant should not have been questioned during so much of the night when he was tired. Aside from the fact that in his testimony defendant denied he told the officers he was tired and wanted rest, the court disposed of that aspect of the matter as follows:

"I am satisfied that this defendant, having struggled within himself for a period of two days, reached the conclusion that he should go and tell some story to the police, and that he voluntarily gave himself up for that purpose. This is not a situation where the police seized a man in the dead of night or at any other time and in effect dragged him or brought him to a police headquarters and proceeded to examine him. The defendant chose the hour to surrender himself. He knew full well that he would be questioned during the night. He could have, had he chosen, waited until the next morning and then called the police or gone to Newark. But I am satisfied he wanted to tell the police something and wanted to do it at the hour that he went to the Neptune Police Station."

In discussing the testimony of defendant's mother, father and sister that they were not permitted to see him on their arrival at headquarters sometime after 9 A. M. on April 8, the trial judge concluded they were not allowed to see him at that time. He found, however, that the detectives who were engaged in the interrogation were not aware of the presence of these members of the family. He recognized this situation as a factor to be considered in passing upon admissibility of the written confession, but held upon an evaluation of all of the evidence that it did not justify a conclusion of involuntariness. He declared particularly that the State had established affirmatively to his satisfaction that defendant had signed the preamble to the written confession with a full understanding of what it meant, of the rights he had in connection with the impending further interrogation, and that the written inculpatory statement of 4½ pages was given voluntarily and without coercion, just as the earlier oral one had been given.

On the matter of the alleged threats, mistreatment and beatings by the detectives, the trial judge concluded defendant's claims were not worthy of belief; further, that he believed and accepted the testimony of the police officers on that subject, and did not believe defendant's assertions; and he specifically found that no brutality had taken place. On this phase of the matter he believed the defendant told the truth when, in answer to his father's question about brutality by the police, he said he had not been beaten. Moreover, the judge disbelieved the parents' and sister's testimony about the condition of Funicello's face and ears when they saw him in court; their allegations were refuted by the photographs taken in the early morning hours of April 8 (and which he had examined), as well as by the testimony of Dr. O'Connor, which he found to be trustworthy. As to the testimony of Gibson and Nolan, the State Prison inmates, he indicated they probably saw the same bruises Dr. O'Connor saw, and he expressed the view that they "exaggerated" in testifying about injuries on defendant's face. He was satisfied that defendant sustained no bruises, contusions or marks at the hands of the police, and he believed the officers' assertions that they had not told him to say he received them in a fall down stairs. Such bruises as Dr. O'Connor found may have come from the struggle between Palmarozza and Funicello at the time of the killing, but since the police did not inflict them he did not consider it necessary to reach a specific conclusion on that score; he would accept defendant's own version that he had fallen down stairs. In sum, the trial court held that before the questioning all of the then-required safeguards were made known to defendant, and that he voluntarily and without physical or mental coercion made his inculpatory statements to the police. Thereafter, the court on two distinct occasions thoroughly explained to the jury the State's affirmative burden of proving that defendant's oral and written inculpatory statements were made voluntarily, and the various factors they should consider in deciding the issue. The first explanation was given after the preliminary hearing on voluntariness

had been held out of the presence of the jury, and after the court had decided, also out of the jury's presence, to admit the statements as voluntary. Again in the charge at the close of the case the advice and instructions were repeated in a comprehensive manner.

Defendant argues in this Court that admissibility of the oral and written confessions should be tested by the rule of *Miranda v. State of Arizona*, 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966). That case was decided June 13, 1966, almost six months after this one was tried and its rule is not to be retroactively applied to such earlier cases although pending on appeal on June 13, 1966. See, *Johnson v. State of New Jersey*, 384 *U. S.* 719, 733–734, 86 *S. Ct.* 1772, 16 *L. Ed. 2d* 882 (1966); *State v. Rudd*, 49 *N. J.* 310 (1967); *State v. Boynes*, 49 *N. J.* 303 (1967); *State v. Lowery*, 49 *N. J.* 476 (1967); *State v. Vigliano*, 50 *N. J.* 51 (1967). Likewise, defendant's contention that his confessions are barred by *Escobedo v. State of Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964), must be rejected. We have held that the *Escobedo* doctrine requires exclusion of confessions only where evidence at the trial shows that the accused requested and was denied counsel or the opportunity to consult with counsel before making the confession. *State v. Billingsley*, 46 *N. J.* 219, 235 (1966); *State v. Green*, 46 *N. J.* 192 (1965), *certiorari* denied 384 *U. S.* 946, 86 *S. Ct.* 1475, 16 *L. Ed. 2d* 544 (1966); *State v. Coleman*, 46 *N. J.* 16 (1965), *certiorari* denied 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed. 2d* 212 (1966).

The test to be applied in this case, and which was utilized by the trial court in passing upon the admissibility of the confessions, is whether, when viewed in the light of the total circumstances attending their giving, they were made voluntarily, understandingly and without any promises of reward or leniency, or threats, or physical or mental coercion. *State v. Billingsley, supra; State v. Bindhammer*, 44 *N. J.* 372 (1965).

We have reviewed carefully the entire evidence relating to Funicello's confessions. It is thoroughly persuasive that when tested by all appropriate factors, a clear conclusion of voluntariness emerges. In our judgment, the conclusion of the trial court and the independent determination of the jury that the State had met its burden of proof in that regard (which the court charged was to show voluntariness beyond a reasonable doubt) finds more than adequate support in the record.

### III

Our conclusion respecting the competency and admissibility of defendant's confessions disposes of his attack on the search of the Lichen property and the seizure there of the murder weapon and articles of blood-stained clothing. Since the statements were voluntary, it follows that the note he wrote to Michelle Lichen, telling her that the knife was hidden in the garage and requesting her to give the police his clothing, was of like nature. The search warrant issued by an Ocean County judge, based on defendant's admissions and the note, obviously was supported by probable cause. The articles seized under it were properly received in evidence. *Warden v. Hayden*, 386 *U. S.* —— 87 *S. Ct.* 1642, 18 *L. Ed. 2d* 782 (1967); *State v. Bisaccia*, 45 *N. J.* 504 (1965).

### IV

Defendant contends the trial court erred in denying his motion for mistrial when the assistant prosecutor made certain improper and prejudicial comments in his summation. As has been alluded to above, Paul Policastro, Esq., not only conferred with defendant for about a half hour before, but also appeared with him as his attorney in the preliminary examination in the municipal court. It is a fair inference that Mr. Policastro observed the condition of defendant's face, head and ears during that time. Nevertheless, he was not called as a witness either by the State or

defendant at this trial. Obviously he would have been a competent witness as to defendant's physical appearance. The attorney-client privilege would not have prevented it, had he been produced by the State; certainly the privilege would not have been a bar, had defendant offered him. *William C. Beach Air Brush Company v. General Motors Corp.*, 118 *F. Supp.* 242 (*D. N. J.* 1953), aff'd 214 *F. 2d* 664 (3 *Cir.* 1954).

In summation the assistant prosecutor asked the rhetorical question: "Where is the attorney, Mr. Policastro, who saw him? He indeed could come forward and tell you about the swellings on his face." At this, defendant moved for a mistrial. The trial court denied the motion, saying:

"I am satisfied that there was no obligation on either side to produce Mr. Policastro, and probably it would have been improper to produce him. He was there in a confidential position.

I am aware of your comments. I will sustain the objection. I will deny the motion for a mistrial. I will instruct the jury most emphatically to disregard what counsel has said about Mr. Policastro. Put it wholly, entirely and completely out of your deliberations. It has nothing whatsoever to do with the case. Is there anything else you wish me to say on the subject?

MR. CLARE: No, Sir."

Counsel persisted, however, in his motion for a mistrial, and the court denied it.

■■■■ We have quoted in full the remarks of the court to indicate the thorough manner in which he removed the State's comment from the case. The direction was so favorable to the defendant, and so emphatic in its instruction to the jury to dismiss the matter from their consideration and deliberations, that we are satisfied beyond a reasonable doubt that any possible prejudice was eliminated from the case.

## V

■■■■ Defendant assigns as further error the refusal of the trial court to allow him to inspect the statements of the proposed State's witnesses in advance of trial. In particular the defense counsel wished to see the statements of Philip Gart-

ner, David Ferguson, Mrs. Lichen and Otto Weil. He submitted their names, quite obviously knew their addresses and he gave no indication they had refused to see him or talk with him about the case. In fact, he said he had already talked with Gartner; we know from this trial that he and his investigator had talked with Ferguson, and obviously Mrs. Lichen and her daughter Michelle were friendly to the defendant. The assistant prosecutor advised the court that the statements of the named persons would be produced at the trial and made available to defense counsel at that time for use on cross-examination. This was in accordance with established practice. *State v. Hunt*, 25 *N. J.* 514 (1958); *State v. Tate*, 47 *N. J.* 352 (1966).

*R. R.* 3:5–11, dealing with discovery and inspection of documents in criminal cases, as it existed when this motion was made, did not authorize or require delivery of witnesses' statements to defendants in advance of trial. Although the rule has been relaxed in extraordinary circumstances, *State v. Farmer*, 45 *N. J.* 520 (1965), 48 *N. J.* 145 (1966), we indicated in *State v. Johnson*, 28 *N. J.* 133 (1958), a reluctance to expand pretrial discovery to include the State's witnesses' statements without further experience with *R. R.* 3:5–11. The problem was reserved for exploration at a judicial conference, and the matter of revision of the rule is presently under consideration. We need only say now that the trial court followed the existing case law and practice rule in denying defendant's motion, and it cannot be said under all the circumstances that error was committed in doing so.

## VI

The final ground of appeal is that the court permitted the assistant prosecutor to testify over objection in a matter material to the case. Defendant's sister, in testifying about certain activities that took place after defendant's preliminary examination in the municipal court, said she had gone out of the courtroom into the street and walked back

to police headquarters. The assistant prosecutor then asked the court to take judicial notice that the courtroom and police headquarters are in the same building. Defense counsel objected to the assistant prosecutor's unsworn testimony and said he should take the stand if he wanted to testify. The court said it would not take such judicial notice, whereupon the assistant prosecutor said: "All right. I think I can prove it if it becomes necessary."

Defendant asserts the State never proved the relative location of the municipal court and police headquarters, and therefore his intimation that Miss Funicello was testifying falsely was prejudicial to the defense. The location in the same building was specifically established on the cross-examination of defendant's father. The matter is of no moment.

## VII

For all the reasons outlined the conviction of defendant is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL and SCHETTINO — 5.

*For reversal* — None.