THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. LEO ROBERT FORCELLA, DEFENDANT-APPELLANT.

THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. GABRIEL ORNES, JR., DEFENDANT-APPELLANT.

THE STATE OF NEW JERSEY, PLAINTIFF-RESPON-
DENT, v. ISRAEL PEREZ, DEFENDANT-APPELLANT.

THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. VICTOR R. FUNICELLO, DEFENDANT-APPELLANT.

Argued June 3, 1968—Decided July 3, 1968.

264

266

Mr. *Anthony G. Amsterdam,* of the District of Columbia bar, argued the cause for appellants (*Mr. Joseph Barry,* attorney for appellant Forcella; *Messrs. George Logan, III,* and *Morton Stavis,* attorneys for appellant Funicello; *Messrs. Jack Greenberg, Michael Meltsner, Jack Himmelstein,* and *Charles Stephen Ralston,* of the New York bar, attorneys for appellants Forcella and Funicello).

Mr. *Ronald J. Picinich* argued the cause for appellant Ornes (*Mr. Charles J. Sakany,* attorney for appellant Perez).

*Mr. James R. Zazzali,* Assistant Prosecutor of Essex County, and *Mr. Guy W. Calissi,* Prosecutor of Bergen County, argued the cause for respondent (*Mr. Joseph P. Lordi,* Prosecutor of Essex County, attorney; *Mr. Richard F. Aronsohn,* Special Assistant Prosecutor of Bergen County, and *Mr. Harold N. Springstead,* Assistant Prosecutor of Bergen County, on the brief).

*Mr. Richard Newman,* Deputy Public Defender, argued the cause for the Intervenor, The Office of the Public Defender (*Mr. Peter Murray,* Public Defender; *Messrs. John M. Cannel, Claude J. Minter, Carl R. Soller,* and *Mrs. Miriam N. Span,* Assistant Public Defenders, on the brief).

*Mr. John W. Hayden, Jr.,* Assistant Attorney General, argued the cause *amicus curiae* (Mr. Arthur J. Sills, Attorney General of New Jersey; *Mr. Samuel D. Bornstein,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. On April 8, 1968 the United States Supreme Court decided *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed.* 2d 138, declaring invalid a federal kidnapping statute under which a defendant who insisted upon trial by jury could suffer the death penalty. Although our homicide statute levies no such burden on an assertion of the right to jury, nonetheless the thesis of *Jackson* is arguably so sweeping as to embrace our statute. In a state of seven million inhabitants wherein homicides unhappily are prevalent, the question whether our murder statute is valid, and if not, what part remains, is obviously urgent. We therefore invited a prompt presentation of the issue.

In the Forcella and Funicello matters the issue arises on post-conviction attacks upon judgments of death heretofore affirmed on direct appeal. *State v. Forcella,* 35 *N. J.* 168 (1961), *certiorari* denied, 369 *U. S.* 866, 82 *S. Ct.* 1035,

8 *L. Ed. 2d* 86 (1962); *State v. Funicello,* 49 *N. J.* 553 (1967), *certiorari* denied, 390 *U. S.* 911, 88 *S. Ct.* 837, 19 *L. Ed. 2d* 882 (1968). Other questions raised in those matters will also be considered. In Ornes and in Perez, the *Jackson* issue is raised by a motion before us to eliminate the death penalty from the forthcoming trial of the indictments. We invited that interlocutory motion to get to the *Jackson* question, but we declined to accept unrelated issues which Ornes and Perez presented to the trial court.

## I

■ *Jackson* involved a simple situation. As construed, the federal kidnapping statute subjected a defendant to the risk of the death sentence if he was tried by jury, but no more than life imprisonment if tried by a judge. Upon that interpretation, it is perfectly plain that the Sixth Amendment right to jury trial was infringed. To impose upon one who pleads not guilty an extra penalty because he insists upon a jury is so patently bad that no more need be said. The statute was held invalid by the trial court in those elementary terms. *United States v. Jackson,* 262 *F. Supp.* 716 (*D. Conn.* 1967).

## A

Our homicide statute harbors no such problem. The death penalty does not depend upon whether the not-guilty plea is tried with or without a jury. Indeed the right to trial by jury cannot be waived. *R. R.* 3:7–1(a). The issue of guilt must be tried by a jury, and the jury alone decides, if the verdict is for first-degree murder, whether the punishment shall be death or life imprisonment, *N. J. S. A.* 2A: 113–4,[1] and the jury must be unanimous as to punishment.

---

[1] The statute reads:
"Every person convicted of murder in the first degree, his aiders, abettors, counselors and procurers, shall suffer death unless the jury shall by its verdict, and as a part thereof, upon and after the

*State v. Reynolds,* 41 *N. J.* 163, 187–188 (1963), *certiorari* denied, 377 *U. S.* 100, 84 *S. Ct.* 1930, 1934, 12 *L. Ed. 2d* 1050 (1964). Thus, unlike the kidnapping statute involved in *Jackson,* there is no pressure on one who stands trial to forego his right to a jury.

Our problem arises because under the federal kidnapping statute a defendant could avoid the death penalty not only by waiving a jury, but also by pleading guilty, and the opinion in *Jackson* speaks of both bases of immunity from the death sentence. If the second basis, *i. e.,* a guilty plea, is itself a separate ground for the result in *Jackson,* then *Jackson* may implicate our murder statute, for although our statute expressly prohibits a guilty plea, it does permit the trial court to accept a plea of *non vult* to the indictment, whereupon the sentence shall be either life imprisonment or the term of years authorized for murder in the second degree. *N. J. S. A.* 2A:113–3.[2] Thus our statute resembles the federal kidnapping act in the respect that if a defendant offers a *non vult* plea (and it is tantamount to a plea of guilt), he cannot suffer death. But even here our statute is different, for whereas, as we will later point out,[3] the federal defendant had, in practical effect for present purposes, a right to plead guilty under the kidnapping act, the state defendant has no right to plead *non vult.* The acceptance of

consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed.

Every person convicted of murder in the second degree shall suffer imprisonment for not more than 30 years."

[2] This statute reads:

"In no case shall the plea of guilty be received upon any indictment for murder, and. if, upon arraignment, such plea is offered, it shall be disregarded, and the plea of not guilty entered, and a jury, duly impaneled, shall try the case.

Nothing herein contained shall prevent the accused from pleading non vult or nolo contendere to the indictment; the sentence to be imposed, if such plea be accepted, shall be either imprisonment for life or the same as that imposed upon a conviction of murder in the second degree."

[3] See *fn.* 8, *infra.*

the *non vult* plea rests in the discretion of the court, and in deciding whether to accept the plea, the judge passes upon the question whether the death sentence would be appropriate, and will refuse the plea if under the circumstances there should be a jury's determination of punishment. *State v. Belton,* 48 *N. J.* 432 (1967); *State v. Sullivan,* 43 *N. J.* 209, 246 (1964), *certiorari* denied, 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed. 2d* 477 (1966).

As we noted above, the trial court in *Jackson* found the federal statute contravened the Sixth Amendment *right to jury trial* in that a defendant who contested guilt could suffer a greater punishment if he insisted upon his right to a jury. The opinion of the majority of the Supreme Court in *Jackson* cites *Spillers v. State,* 436 *P. 2d* 18 (*Nev. Sup. Ct.* 1968), where a statute relating to rape and providing for punishment by imprisonment for not less than 20 years or "death, if the jury by their verdict affix the death penalty," was also found to infringe the *right to trial by jury.* The dissenting opinion in the Supreme Court in *Jackson* also speaks solely in terms of *the right to jury trial.* ⌊If the majority in *Jackson* held only that the Sixth Amendment was violated, *Jackson* could not reach our statute, for the right to trial by jury is not at all involved when, as under our statute, the *quantum* of punishment does not turn upon whether the *trial* is by a judge or by a jury.⌋ This is made clear by a hypothetical case: if a statute provided that the death penalty may be imposed when guilt is found either by judge or by jury, but that life imprisonment is the maximum penalty upon a plea of guilty, it could not be said *the right to jury trial* is burdened. Such a statute would no more burden that right than it would burden any other Sixth Amendment right relating to the mode or manner of a trial of a contested issue, *i. e.,* "the right * * * to be confronted with the witnesses against him" or the right "to have compulsory process for obtaining witnesses in his favor" or the right to the assistance of counsel for his defense. Rather it is the right *to defend* which the

hypothetical statute would involve, and that would bring into view the Fifth Amendment privilege against compulsory self-incrimination rather than the Sixth Amendment jury right.

As we have said, under our murder statute the death penalty is not contingent upon whether an accused defends before a jury or before the court alone, and in fact all who defend must do so before a jury. Hence the sole possible challenge to our statute is that it offends the Fifth Amendment in that the provision for a plea of *non vult* may improperly induce defendants to waive their privilege against compulsory self-incrimination and to submit to a judgment of conviction.

Although the federal statute obviously ran afoul of the Sixth Amendment, yet, as we have noted, the majority opinion in *Jackson* did speak also of the Fifth Amendment. Since the federal statute was plainly invalid under the Sixth Amendment, of course no more had to be said to strike it down; and if a limitation of punishment upon a plea of guilty would necessarily violate the Fifth, there was no need to rely also upon the Sixth. But a court may deliberately rest a result upon two distinct, independent bases. The question is whether the majority in *Jackson* did so. As we read their opinion, the two propositions were not separately stated but rather were intertwined, thus suggesting that not all members of the majority were ready to say that a statute which did no more than limit the penalty upon acceptance of a guilty plea must violate the Fifth Amendment.

Thus the majority opinion states the issue in these terms, 390 *U. S.* at 581, 88 *S. Ct.* at 1216, 20 *L. Ed. 2d,* at p. 138:

"* * * Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert *the right to contest their guilt before a jury.* The inevitable effect of any such provision is, of course, to *discourage* assertion of the Fifth Amendment right not to plead guilty and

to *deter* exercise of the Sixth Amendment right to demand a jury trial. * * *"

We have underscored "the right to contest their guilt before a jury." As we have already shown, the right to a jury trial is irrelevant to the Fifth Amendment issue, for a defendant who can escape the death penalty by agreeing to contest guilt before a judge alone is under no pressure to plead guilty. Thus the use of the quoted words in the statement of the problem indicates that the majority was not dealing separately with the distinct question whether the Fifth Amendment would be affronted by a statute which did no more than forbid a death sentence on a plea of guilty.

Continuing to speak of the issue in terms which did not separate the Fifth Amendment from the Sixth, the majority opinion says (390 *U. S.* at 582, 88 *S. Ct.* at 1216, 20 *L. Ed. 2d,* at *p.* 147) :

"The Government suggests that, because the Act thus operates 'to mitigate the severity of punishment,' it is irrelevant that it 'may have the incidental effect of inducing defendants not to contest in full measure.' We cannot agree. Whatever might be said of Congress' objectives, they cannot be pursued by means that *needlessly* chill the exercise of basic constitutional rights. Cf. United States v. Robel, 389 U. S. 258, 88 S. Ct. 419, 19 L. Ed. 2d 508; Shelton v. Tucker, 364 U. S. 479, 488–489, 81 S. Ct. 247, 5 L. Ed. 2d 231, 237–238. The question is not whether the chilling effect is 'incidental' rather than intentional; the question is whether that effect *is unnecessary and therefore excessive.* In this case the answer to that question is clear. The Congress can of course mitigate the severity of capital punishment. The goal of limiting the death penalty to cases in which a jury recommends it is an entirely legitimate one. But that goal can be achieved without penalizing those defendants who *plead not guilty and demand jury trial.* In some States, for example, the choice between life imprisonment and capital punishment is left to a jury in *every* case—regardless of how the defendant's guilt has been determined. Given the availability of this and other alternatives, it is clear that the selective death penalty provision of the Federal Kidnaping Act cannot be justified by its ostensible purpose. Whatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that *needlessly* penalizes the assertion of a constitutional right." (Emphasis added.)

We have stressed the conjunction of "plead not guilty" with "and demand jury trial." We have emphasized the words "needlessly" and "unnecessary and therefore excessive" for those words immediately suggest a difference between the two constitutional issues if treated separately. As to the Sixth Amendment right of jury trial, the burden of the federal statute could only be "needless," for it can serve no legitimate end to make the penalty turn on whether the accused defended before a jury or before a judge alone. But when the focus is upon the Fifth Amendment, *i. e.,* the impact upon the *right to defend,* other values come into play and may demonstrate that the incidental impact upon that right is not "needless" or "unnecessary" or "excessive."

In this regard, we refer to the following passage, in the final portion of which the majority opinion almost zeroed in upon the Fifth Amendment problem alone (390 *U. S.,* at *p.* 584, 88 *Ct.,* at *p.* 1217, 20 *L. Ed. 2d,* at *p.* 158):

"The Government alternatively proposes that this Court, in the exercise of its supervisory powers, should simply instruct federal judges sitting in kidnaping cases to reject all attempts to waive jury trial and all efforts to plead guilty, however voluntary and well-informed such attempted waivers and pleas might be. In that way, we could assure that every defendant charged in a federal court with aggravated kidnaping would face a possible death penalty, and that no defendant tried under the federal statute would be induced to forego a constitutional right. But of course the inevitable consequence of this 'solution' would be to force all defendants to submit to trial, however clear their guilt and however strong their desire to acknowledge it in order to spare themselves and their families the spectacle and expense of protracted courtroom proceedings. * * * But the fact that jury waivers and guilty pleas may occasionally be rejected hardly implies that all defendants may be required to submit to a full-dress jury trial as a matter of course. Quite apart from the cruel impact of such a requirement upon those defendants who would greatly prefer not to contest their guilt, it is clear—as even the Government recognizes—that the automatic rejection of all guilty pleas 'would rob the criminal process of much of its flexibility.' * * * If any such approach should be inaugurated in the administration of a federal criminal statute, we conclude that the impetus must come from Congress, not 'from this Court.'"

The Court there indicates that, as to the Fifth Amendment problem, there are countervailing considerations. The Court deems it "cruel" to require all defendants to submit to a full-dress jury trial, and says that to bar guilty pleas would rob the criminal process of needed flexibility. With these thoughts we agree, but if *all* defendants must risk the death sentence, how can those consequences be avoided? If a defendant who pleads guilty must be subjected to a trial as to punishment, it seems impossible to avoid a "full-dress" presentation of the facts of the crime, for it is hard to see how the death sentence could be considered without the full story of the criminal event. And if a defendant must risk a death sentence if he acknowledges his guilt, there will be an inducement not to offer a plea which otherwise would be forthcoming.

 Of course no man should receive an extra penalty because he defends against a charge, *United States v. Wiley,* 278 *F. 2d* 500, 504 (7 *Cir.* 1960), but it does not follow that a man who acknowledges his guilt should not be given consideration on that account. The issue is not limited to the capital case. However controversial, so-called "plea bargaining" has respectable support. *State v. Taylor,* 49 *N. J.* 440, 455 (1967); *Barber v. Gladden,* 220 *F. Supp.* 308, 314 (*D. Ore.* 1963), affirmed, 327 *F. 2d* 101 (9 *Cir.* 1963), *certiorari* denied, 377 *U. S.* 971, 84 *S. Ct.* 1654, 12 *L. Ed. 2d* 741 (1964); *Dee Rose v. Gladden, Ore.,* 433 *P. 2d* 612, 613 (*Sup. Ct.* 1967); *Commonwealth v. Maroney,* 423 *Pa.* 337, 223 *A. 2d* 699, 703–706 (*Sup. Ct.* 1966); *Task Force Report: The Courts* (The President's Commission on Law Enforcement and Administration of Justice, 1967) *pp.* 9–11; *Standards Relating to Pleas of Guilty,* §§ 3.1–3.4 (A. B. A. Project on Minimum Standards for Criminal Justice, *Tent. Draft,* Feb. 1967); *Newman, Conviction: The Determination of Guilt or Innocence without Trial* (1966) *p.* 28; 8 *Moore, Federal Practice* (*2d ed.* 1968) § 11.05; Note, 112 *U. Pa. L. Rev.* 865 (1964). And wholly apart from such express agreements for leniency,

it is commonplace for sentencing judges to give weight to a guilty plea, and correctly so, since a man who confesses is probably a better prospect for rehabilitation. *State v. Ivan,* 33 *N. J.* 197, 203 (1960). The concept is just and humane. We should not deny a justified leniency for the many, merely to be positive that no man is needlessly encouraged not to defend.[4] But if the Fifth Amendment bars a lesser penalty when guilt is admitted, then all of this must be wrong.

Surely there can be no distinction in this regard between a judge-made policy and a legislated prescription. If a policy offends the Fifth Amendment, it cannot matter which branch of government evolved it. Nor can a line be drawn between the capital and the non-capital case. The prospect of death is far more compelling, but a term of years is not so trivial a matter as to be beyond that constitutional protection if in principle it applies.

If *Jackson* holds that the Fifth Amendment forbids a limitation to life imprisonment on a plea of guilty, it follows that wherever capital punishment obtains, all defendants will have to stand trial as to punishment. And that is precisely what will follow in our State, and even more, for if *Jackson* applies to our statute, it will invalidate, as we will presently point out, the statutory amendment of 1893 (*c.* 36) which introduced the *non vult* plea, with the

---

[4] *Jackson* says "the evil in the federal statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them." 390 *U. S.* at 583, 88 *S. Ct.*, at *p.* 1217, 20 *L. Ed.* 2d, at *p.* 148. The gain to the many surely outweighs whatever evil may repose in encouraging the guilty to plead guilty. And as to a fear that the innocent might be stampeded, there are safeguards against a false guilty plea. The trial court inquires into voluntariness and in that connection the subject of guilt is logically relevant. A plea of guilty may not be accepted if the accused claims he is innocent. See *State v. Reali,* 26 *N. J.* 222 (1958). *Fed. R. Crim. P.* 11 provides that "The Court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

result that everyone indicted for murder will have to stand trial as to both guilt and punishment.

To require every defendant to risk the death sentence would be a serious slide backwards. The 1893 act was intended to ameliorate the course of capital punishment. Prior thereto, the penalty for murder in the first degree was mandatorily death, and if a defendant was convicted on confession in open court, the court had to "proceed, by examination of witnesses, to determine the degree of the crime and give sentence accordingly." *N. J. Revision* 1709–1877, *Crimes,* § 68, *p.* 239. Thus, on a plea of guilty, the penalty was death if the murder was later determined to be in the first degree.

The 1893 statute made two changes, to improve the plight of defendants charged with murder. It abolished the plea of guilty, thus eliminating "a ready and facile road to the gallows," *State v. Genz,* 57 *N. J. L.* 459, 462 (*Sup. Ct.* 1895). As *Genz* pointed out, judges from the earliest times, abhorring to enter a death judgment on a defendant's admission, generally advised prisoners to retract the plea and to plead to the indictment. Thus in practical effect the 1893 statute served "to substitute for the advice of the judge the mandate of the law, that the citizen shall not be adjudged to death upon his own confession, but that, *in favorem vitae,* the state shall prove, in all respects, to the satisfaction of a jury, the crime laid in the indictment" (*p.* 463). Prompted by *Hallinger v. Davis,* 146 *U. S.* 314, 13 *S. Ct.* 105, 36 *L. Ed.* 986 (1892), in which the imposition of a death sentence on a guilty plea was upheld, the Legislature decided to end that practice. *Trenton Daily State Gazette,* Feb. 14, 1893, *p.* 5. Having thus abolished the plea of guilty, the 1893 act authorized a plea of *non vult* or *nolo contendere,* but being opposed to the imposition of a death sentence upon a defendant's plea, the Legislature provided "The sentence to be imposed, if such plea be accepted, shall be the same as that imposed upon a conviction of murder in the second degree."

■ Thus the *non vult* plea was intended to benefit murder defendants, permitting the court, if the facts so warranted, to accept a plea which would bar the death penalty. When later the jury was authorized to recommend life imprisonment by *L.* 1916, *c.* 270,[5] the Legislature increased the authorized maximum on a *non vult* plea to life imprisonment. *L.* 1917, *c.* 238. Although the maximum on the plea was increased, the purpose again was to improve the lot of homicide defendants, by encouraging courts to accept a *non vult* plea in circumstances in which a maximum of a term of years might be deemed inadequate and therefore to require a trial with the possibility of a death sentence.[6] We add that recently, in harmony with that legislative policy, we determined that where a defendant stands trial, the prosecutor has the discretion not to seek the death penalty, and if he so decides and the court approves, the death penalty goes out of the case. *In re Waiver of Death Penalty,* 45 *N. J.* 501 (1965) ; *R. R.* 3 :1–3*A.* The result is

[5] This statute was adopted pursuant to the report in 1908 of the Senate Committee to Inquire into the Subject of Capital Punishment, which Committee recommended retention of capital punishment for heinous crimes but that the jury determine whether the punishment should be death or life imprisonment. *State v. White,* 27 *N. J.* 158, 173 (1958) ; *State v. Sullivan, supra,* 43 *N. J.,* at *pp.* 244–245.

[6] The statement annexed to the bill which became the 1917 statute read :

"In the past it has often occurred that the plea of non vult or nolo contendere was not accepted, because it was felt that the particular crime deserved a greater punishment than that provided for murder in the second degree. Pleas of this character have undoubtedly been refused which would have been accepted had there been a discretion lodged in the Court of imposing a sentence of imprisonment for life.

It can be very readily seen why the policy of the State would ‚be opposed to accepting a plea of guilty if it meant a death penalty, but the same reason does not apply to a sentence of life imprisonment. An amendment of this character will take care of those cases that require a more severe punishment than that provided for murder in the second degree and yet where the State's officers would seem to be justified in accepting something less than the penalty of death."

that as to every murder indictment some official agency considers the fitness of the death penalty, the judge doing so on a plea of *non vult,* and either the prosecutor with the court's approval or the trial jury doing so when the defendant stands trial.

The foregoing account shows the 1893 statute was adopted, not to coerce a defendant to offer a plea of *non vult,* but on the contrary to the humane end that a guilty defendant need not run the gauntlet of a trial on capital punishment if a judge shall find it is just that he should not. This decent objective will be defeated if *Jackson* applies, not only in our State[7] but inevitably as well in every jurisdiction in which the death penalty is authorized.

To recapitulate, then, our statute differs from the federal kidnapping statute involved in *Jackson* in these respects:

(1) The federal statute plainly violated the Sixth Amendment right to trial by jury, by differentiating between a trial with a jury and a trial without a jury. Our statute, on the other hand, does not bear upon the Sixth Amendment right; in fact a trial may be had only before a jury.

(2) With respect to the Fifth Amendment question, the federal defendant has a "right," in a realistic sense, to plead guilty.[8] Under our statute a defendant may not plead guilty; and he may plead *non vult* only with the approval of the trial judge, who, in dealing with an offer so to

---

[7] The Public Defender has supplied us with the following information as of May 1968: Of the 501 men in jail on convictions upon indictments for murder, 325 pled non vult. Of the 38 women so convicted, 16 pled non vult.

[8] Although the right is not "absolute," as *Jackson* points out, 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d,* at *p.* 148, and *Fed. R. Crim. P.* 11 provides that the court "may refuse to accept a plea of guilty," we assume the plea would not be refused if the defendant is competent and his guilty plea is consonant with the facts. *Jackson* does not suggest the trial court could have refused the plea because it thought the death penalty might be warranted. On the contrary, *Jackson* said it would be "cruel" to compel a guilty man to submit to a trial upon guilt. 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d,* at *p.* 148.

plead, considers whether the circumstances warrant the submission of the death-penalty issue to a jury. Thus, a defendant cannot forego a defense solely on his own decision, and in a substantial sense, a judge passes upon the same question which a jury would have if the issue of punishment were submitted to it, the difference being that the jury would decide that issue whereas the trial judge decides that the circumstances are such that the penalty issue need not be submitted.

(3) Finally, whereas the federal statute "needlessly" (in fact inexcusably) imposed a penalty on the exercise of a constitutional right, there the Sixth Amendment right to jury, our statute imposes no such penalty at all, and insofar as the Fifth Amendment right may be thought to be involved, our statute does not "needlessly" restrain it. Our statute was not designed to coerce *non vult* pleas; it was intended to operate, and in fact does, to the benefit of defendants as a group. The purpose is humane, and so is its overall impact. The alternative would be "cruel," to take a word from *Jackson,* for it would require *all* defendants to undergo a trial and to do so at the risk of life.

We recognize that *Jackson* may be read to embrace our statutory scheme, but the subject matter of *Jackson* was different in the respects we have described. It is axiomatic that opinions, no less than other compositions, must not be read literally. Being of the view that our statute does not offend the Fifth Amendment, we should not adjudge it invalid upon a debatable reading of an opinion which in fact dealt with a statute we think was fundamentally different.

B

Upon our view that *Jackson* does not apply, it of course is unnecessary to decide the impact *Jackson* would have upon our statute if it did reach it. Since, however, we may be wrong in our understanding of *Jackson,* and since the public interest would be disserved by any period of uncer-

tainty with respect to a statute dealing with murder, we should state now what the consequences will be if the United States Supreme Court holds the statute does come within *Jackson*.

In *Jackson* the Supreme Court, finding the kidnapping statute was severable in its provisions, struck down the death penalty so that life imprisonment alone remained. That result was indicated by the history of the statute. The statute was adopted in 1932, and the death penalty was added in 1934. The constitutional infirmity having arisen out of the 1934 amendment, it is easily concluded the amendatory statute failed, leaving the kidnapping statute in its original form. When the defect is generated by a statute which introduced the death penalty, a court would have to go beyond the manifested intent of the Legislature to say the Legislature wanted the death penalty to prevail.

In our situation it was the 1893 statute cited above (*c*. 36) which, on the hypothesis that *Jackson* applies, introduced the constitutional infirmity. Prior thereto all defendants convicted of first-degree murder, whether by trial or on a plea of guilty, suffered death. See the history of our murder statute recounted in *State v. Sullivan, supra*, 43 *N. J.*, at *pp.* 242–243. If the 1893 statute created a constitutional infirmity by limiting the punishment on a *non vult* plea, the answer must be that the 1893 statute never had constitutional vitality. We heretofore said that if the *non vult* plea involved a constitutional infirmity, the provision for the *non vult* plea would fall and a defendant who stood trial could claim no benefit from that infirmity. *State v. Sullivan, supra*, 43 *N. J.*, at *p.* 247; *State v. Reynolds, supra*, 43 *N. J.*, at *p.* 603.

This must be so because we could not find the Legislature was so determined to have the *non vult* plea that it would prefer to scuttle capital punishment. Indeed, if the 1893 act prevailed over the then-existing provisions for capital punishment, there would have remained no punishment for first-degree murder. This is because the sole penalty

theretofore authorized for first degree murder was death. Hence if that penalty went by the boards, the only punishment authorized would have been for murder in the second degree, then a term of 20 years. *N. J. Revision,* 1709-1877, § 69, *p.* 239. Finding no conceivable basis for saying the legislators who voted for the 1893 act intended to abolish capital punishment if necessary to permit a *non-vult* plea, we must hold it would be the *non-vult* plea which died aborning, because of the constitutional impediment to its being.

Nor can we reach a different result because, as already mentioned, the Legislature in 1917 (*c.* 238) "amended" the *non-vult* provision to authorize a maximum sentence of life imprisonment. The amendment of course did not eliminate the *Jackson* issue, since death still remained the maximum for those who stood trial. Indeed, if the death penalty were somehow struck, the 1917 amendment would still involve a *Jackson*-type difficulty in that one who stood trial would receive a life sentence for first-degree murder while a defendant whose *non vult* plea was accepted could receive a sentence for a term of years. In any event, it is crystal clear the Legislature could not have intended that a constitutional difficulty in the 1917 statute should be resolved by eliminating the death penalty. On the contrary the Legislature had just rejected an attempt to abolish capital punishment, and had decided to go no further than to empower the jury to recommend life imprisonment. This it did by the 1916 statute already mentioned (*c.* 270). See *State v. While, supra,* 27 *N. J.,* at *p.* 173. As we said earlier, the 1917 statute increased the maximum on the *non vult* plea to life imprisonment so that a defendant who offered the plea would not be required to risk a death sentence because a sentence less than life imprisonment was inappropriate.

The history of capital punishment in this State is well documented. In that light, we could hardly accept the extraordinary proposition that the 1893 act or the 1917 act,

or any general revision of the laws, spelled out an intent that the death penalty should fall if the introduction of the *non vult* plea created a constitutional impasse. Capital punishment lies within the authority and the responsibility of the Legislature, and the Legislature has expressly and continuously dealt with the subject. There have been numerous efforts to abolish it.[9] As recently as 1964 a study commission created by joint resolution of the Legislature recommended that the death penalty be retained. *Report of New Jersey Commission to Study Capital Punishment* (Oct. 1964). It is not our responsibility, or authority, whatever our individual views on capital punishment, to impute to the Legislature a repeal it has consistently refused to enact during more than a century of agitation upon this subject.

It follows, then, that if *Jackson* is held to apply, the *non vult* plea will go. Upon that hypothesis, the question was argued whether our murder statute would revert to the pre-1893 state, under which the penalty for first-degree murder would be death in every case. We see no reason to say so. The 1916 amendment which provided that the jury may fix the punishment at life imprisonment in no sense depended upon the availability of a *non vult* plea.

The only question we see is whether the plea of guilty which the 1893 statute expressly purported to abolish nonetheless continued because that statute failed in its effort to introduce the *non vult* plea. We are satisfied the abolition of the plea of guilty did not depend upon the viability of the plea of *non vult*. As we have already pointed out, there was strong hostility to the imposition of a death sentence upon a plea of guilty, and therefore so much of the 1893 statute

---

9 In each of the following years bills were introduced to abolish capital punishment: 1956 (A–564 and A–565); 1957 (A–19 and A–21); 1958 (A–33 and A–34); 1959 (A–355, A–625 and A–626); 1961 (A–518); 1962 (S–222); 1963 (A–117 and S–26); 1965 (S–35, S–210, and S–226); 1966 (S–30, S–31, and S–353); 1967 (A–46, A–558, and A–559); 1968 (S–180, S–181, and S–184).

as abolished that plea may readily be deemed severable from the invalid remainder. Moreover in introducing the life sentence as part of a jury verdict by its 1916 statute, the Legislature acted on the implicit premise that the guilty plea was gone, for it authorized the jury, and only the jury, to recommend life. To find the 1893 statute failed to abolish the guilty plea would lead to this gross incongruity: that a defendant who pleads guilty to an offense found by a judge to be murder in the first degree must suffer death, whereas upon a jury's finding of guilt in that degree, the punishment may be imprisonment for life.

Hence, if *Jackson* should be held to apply, all defendants to murder indictments will have to go to trial, at which trial a defendant of course may choose not to controvert the evidence upon the issue of guilt, a position which defendants have not uncommonly taken when the only real question was that of punishment. *State v. White, supra*, 27 *N. J.*, at *pp.* 172-173.

### C

■ The remaining question is whether, if the *non vult* plea falls because of *Jackson*, a defendant under a death sentence may complain. We do not see how he can. Upon that hypothesis, he was not penalized because he stood trial. He was dealt with in accordance with the statute, which, on the stated hypothesis, does not permit a *non vult* plea and requires a jury determination as to guilt and punishment in every case. To put it another way, a reversal could only lead to a retrial on the very same basis upon which the challenged trial was held. Rather, if the *non vult* plea was never constitutionally permissible, it is the defendant who was sentenced on such a plea who alone could contend his Fifth Amendment right was invaded. As to a defendant so situated, other questions would be involved, and we see no immediate need to resolve them.

Pending clarification, the trial courts should continue to deal with murder indictments as heretofore. We see no

practical alternative. We should not subject all defendants to the risk of a death sentence unless that course is clearly required. Nor can we suspend all prosecutions in so important an area until the issue is finally settled.

## II

Defendants Forcella and Funicello raise a number of additional issues, as to which, however, they ask that we make no determination at this time. Rather they seek a remand for a so-called "evidentiary" hearing.

The suggested hearing does not relate to any factual issue in either case. Rather it would deal with sociological or psychological data bearing upon the soundness of existing constitutional doctrines which defendants want to challenge.

It should be made very plain that no claim is made that the trial court refused to permit defendants to offer any evidence on hand. The record of the argument before the trial court was not furnished to us, and hence at the argument before us we pressed counsel to state specifically what offer was made, see *State v. Abbott,* 36 *N. J.* 63, 77 (1961), but nothing concrete emerged. We invited counsel to make an offer of proof before us, and as we understand the response, there is no data in being except some studies relating to the question whether a jury selected with regard to scruples upon capital punishment is conviction-prone, which material we invited counsel to submit to us. This material seems to be essentially the material submitted, presumably by the same counsel who appeared before us, to the United States Supreme Court in *Witherspoon v. State of Illinois,* 391 *U. S.* 510, 511, 88 *S. Ct.* 1770, 1771, 20 *L. Ed. 2d* 776, 779 (1968), and cited in *fn.* 10 in that opinion. Beyond the reference just referred to, counsel, in their brief and orally, spoke only in general terms of sociological or psychological studies, some under way and others not yet undertaken, which counsel hope will support an assault upon established doctrines. Thus, although

defendants speak in terms of a "hearing," they are unable to say what they can offer and in substance really ask that the issues remain unresolved until such time as they may be able to mount an attack. Hence it cannot be said that defendants were denied an evidentiary hearing; there was no evidence to be heard.

We are mindful that in the process of law-making judges are too often without facts desirable or even necessary for the formulation of sound doctrine. See *State v. Johnson,* 43 *N. J.* 572, 583 (1965). The judicial process does not match the legislative process in that regard, at least at the theoretical level. There is no "hearing" to which all who are interested may come and contribute. Rather we deal with the record the litigants may make, which rarely bears upon the law-making phase of the case, and such material as may be available in published form. In some instances we have called for proof of available data. Regrettably, the process is not too satisfactory, and especially so when the subject lends itself to the familiar battle of experts, or when the subject, because of its nature, cannot be reduced to conclusions of evident detachment and reliability.

This shortcoming in the judicial process is of even greater concern when a court labors in the field of constitutional law, and of course the reason is the enduring quality of organic doctrines and the restraints such doctrines may impose upon government. But while we welcome whatever aid we can get and would reach for data already in being, we cannot suspend the judicial process until projected studies are made at the behest of a litigant. This is especially true when the studies are of a sociological or psychological nature, for the prospect is remote that such studies will yield views of human behavior of such incontestable, eternal truth that existing constitutional doctrines will have to retreat before them. Such studies hold too little promise to warrant what would amount to an indeterminate stay of the judicial process in a critical area.

We will therefore proceed to a consideration of the issues.

## A

It is argued that our murder statute denies due process because it contains no specific standard for a jury's determination of punishment. *N. J. S. A.* 2*A* :113–4 says only that the decision shall be made "upon and after the consideration of all the evidence."

The attack is the same one we rejected in *State v. Johnson,* 34 *N. J.* 212, 229–230 (1961), appeal dismissed, 368 *U. S.* 145, 82 *S. Ct.* 247, 7 *L. Ed.* 2d 188, *certiorari* denied, 368 *U. S.* 933, 82 *S. Ct.* 370, 7 *L. Ed.* 2d 195 (1961). To the same effect is *In re Ernst's Petition,* 294 *F.* 2d 556 (3 *Cir.* 1961), *certiorari* denied, 364 *U. S.* 943, 81 *S. Ct.* 462, 5 *L. Ed.* 2d 374 (1961) and 368 *U. S.* 917, 82 *S. Ct.* 198, 7 *L. Ed.* 2d 132 (1961). The statute is no more explicit because it seems impossible to be more precise without being unduly limiting. Counsel do not suggest any formulation, and we can think of none. See *Winston v. United States,* 172 *U. S.* 303, 19 *S. Ct.* 212, 43 *L. Ed.* 456 (1899).

Some subjects do not lend themselves to specific standards. There is no standard to guide the Legislature in deciding whether to exert the police power. There is no standard for an executive veto, or for executive clemency. So within the judicial branch there is no real standard for sundry matters which therefore are committed to nothing more explicit than a sound discretion. Although the Constitution may require a standard whenever one is feasible and serviceable, it cannot follow that government must be denied all powers which defy a definitive statement of the basis for their exercise.

Here, the Legislature committed the decision upon punishment to twelve jurors, to be made upon and after a consideration of all the evidence. A reasoned judgment can be reached upon an appraisal of the total circumstances even though no one can articulate in advance a detailed list of conceivable factors or their relative weights.

We see nothing in *Giaccio v. State of Pennsylvania,* 382 *U. S.* 399, 86 *S. Ct.* 518, 15 *L. Ed. 2d* 447 (1966), which runs against our holding in *Johnson.* There declared invalid was a statute which, without a prescribed basis, authorized juries to award costs against a defendant who is acquitted. In footnote 8, *Giaccio* expressly said "In so holding we intend to cast no doubt whatever on the constitutionality of the settled practice of many States to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits." See also *Johnson v. Commonwealth,* 208 *Va.* 481, 158 *S. E. 2d* 725, 729 *(Sup. Ct.* 1968); *Manor v. State,* 223 *Ga.* 594, 157 *S. E. 2d* 431, 437 *(Sup. Ct.* 1967).

### B

Next defendants complain because under our practice both guilt and punishment are determined at a single trial.

Our statute does not expressly say that evidence may be adduced upon the issue of punishment. At first it was construed to mean that nothing could be shown unless it bore upon the issue of guilt. Later, on the thesis that the man cannot be wholly divorced from the event in evaluating whether the event warranted the death penalty, we permitted the defense to introduce background material although relevant only to punishment. *State v. Mount,* 30 *N. J.* 195, 217–220 (1959). To the same end, a defendant may prove a mental illness which concededly cannot bear upon guilt. *State v. DiPaolo,* 34 *N. J.* 279, 291–292 (1961), *certiorari* denied, 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed. 2d* 80 (1961). The State may contradict whatever the defense offers, but aware of the danger of prejudice on the issue of guilt if the State too could originate proof as to punishment, we have not permitted the State to move into areas not entered by the defense. So, for example, the State may not prove a defendant's criminal record for the purpose of a jury's consideration of punishment. In short, we opened what may be called a one-way street in favor of the accused.

 The complaint now made is that there are situations in which a defendant cannot utilize the opportunity thus created, for fear that something he says may spill over on the issue of guilt or may compromise a denial of guilt. Of course, that kind of dilemma is not novel. A defendant who would contend that the homicide was accidental, or justified, or excused, or that he was not guilty because of insanity, or that because of provocation his offense was no more than manslaughter, faces the insoluble problem of maintaining such a stance without seeming to concede he did the killing. Nonetheless a defendant is not entitled constitutionally to a separate trial upon each issue in the case.

A few States use the bifurcated trial, so that the subject of punishment may be heard after the jury has decided upon guilt. Some defendants may well fare better under that plan. But if there were a separate hearing on punishment, the one-way street we now have would likely be opened to the State too, and for many defendants that would be devastating. We have serious doubts as to whether the bifurcated trial would not worsen the lot of defendants as a group, and for that reason, wholly apart from the question whether our statute is so phrased as to permit bifurcation, we have been reluctant to act until some hard facts are available. If the prosecutor were now free to offer everything relevant to punishment at the trial of guilt, defendants might well gain from bifurcation, but, as we have said, that is not our scene, and it is in the light of what we have that we hesitate to change without some clear evidence that the bifurcated trial would be an improvement here.

 In any event, we do not see the issue as one of constitutional compulsion. *State v. Laws,* 51 *N. J.* 494, *pp.* 511–513 (1968); *State v. Reynolds, supra,* 43 *N. J.,* at *p.* 604. In *United States v. Jackson, supra,* 390 *U. S.* 570, 88 *S. Ct.* at 1209, 20 *L. Ed. 2d,* at *pp.* 145–146, the Court referred to the problems of a bifurcated trial with no intimation that the Constitution requires it. See also *Spencer v. State of Texas,*

385 *U. S.* 554, 87 *S. Ct.* 648, 17 *L. Ed.* 2d 606 (1967); *Johnson v. Commonwealth, supra,* 208 *Va.* 481, 158 *S. E.* 2d, at p. 730; *Segura v. People,* 431 *P.* 2d 768, 769 (*Colo. Sup. Ct.* 1967).

## C

Next it is contended that the exclusion of veniremen for cause by reason of their position on capital punishment denied defendants a representative jury and hence due process and equal protection of the law.

We discussed this issue at length in *State v. Mathis,* 52 *N. J.* 238, decided this day. We pointed out that our cases establish the test of cause found to be correct in *Witherspoon v. State of Illinois, supra,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776.

As to Forcella, the *voir dire* examination reveals the trial court applied our settled rule that a juror may not be excused for cause unless he is unable in any case to consider the subject of capital punishment. Forcella concedes that, with the exception of the four jurors whose testimony we will discuss in a moment, all jurors excused for cause expressed an inability to return a death sentence in any case. We note that counsel for the State and for the defense participated actively in the inquiry, all upon the correct standard, and that before granting a challenge for cause, the trial court invited the views of defense counsel.

As we have said, Forcella questions the trial court's rulings as to four veniremen. We see no error.

As to the venireman Hoff, he testified:

"THE COURT: In no event would you ever vote for the death penalty?
THE JUROR: I don't think I could."

He repeated "I don't think I could; I honestly don't think I could." When in response to a question which ended with "would your vote always be in favor of life and not the death

penalty," the juror answered, "I think I would lean toward life." It is the last quoted answer that defendant now stresses. If no more had appeared, no doubt the trial court would have probed further, but on the total testimony, the juror was maintaining the position that he did not believe he could return a death sentence in any case. When the court asked defense counsel whether he wanted to be heard on the challenge, he answered "No." For the reasons given in *Mathis,* we cannot disagree with the trial court's evaluation of the testimony.

The venireman Heyser testified in terms which left the trial court uncertain as to just where he stood with respect to his ability to consider a death sentence. Nonetheless he was not excused for cause. On the contrary, the trial court excused him upon the consent of both the prosecutor and the defense when both responded favorably to the following:

"THE COURT: Of course I cannot understand what this man means. I think counsel is in the same position as the Court finds itself. I don't know what he means. Is it agreeable to both of you that we excuse him?

■■■■ The prospective juror Huber said she was the mother of six and hence preferred not to serve. Defense counsel offered to excuse her by consent. The trial court declined to permit it. Then followed an examination into the subject of capital punishment, as to which the juror's testimony was equivocal. She thought she could return a death penalty for rape, but was not sure she could send a man to his death for murder. Again the record would warrant a finding that the juror could not be found affirmatively to be impartial, *i. e.,* able to consider the issue of punishment. The trial court asked defense counsel if he wanted to be heard on the challenge and he answered "No, sir."

■■■■ As to the remaining venireman (Halprin) to whom Forcella refers, she seemingly was excused, not because of her views on capital punishment, but because she said she could not abide by the court's instructions upon reasonable

doubt.[10] Again we see no reason to quarrel with the trial court's judgment.

For the reasons given in *Mathis*, we see no basis to say Forcella was denied an impartial jury.

As to Funicello, the issue is asserted in abstract terms, without any reference to the *voir dire* examination. In fact, no transcript of the *voir dire* was submitted either on this review or on the direct appeal from the judgment of conviction, and so far as we have been able to learn, the testimony of the veniremen was never transcribed.

## D

Defendants contend the death penalty offends the Eighth Amendment prohibition against cruel and unusual punishments. The issue is approached from several directions. It is urged the punishment is of that character because there is no stated standard for the jury's decision, because of the

---

[10] The transcript reads:

"BY THE COURT:

Q. Well, now, Madam, I take it what you are saying is that in no case, in no event, would you vote for a verdict of murder in the first degree knowing that the defendant would suffer the death penalty.

A. No.

Q. Well, then what do you mean?

A. It would have to be beyond a shadow of a doubt and not a reasonable doubt. I would have to be absolutely convinced. Then I'd abide by the law.

Q. Now, the law provides a standard and the law provides that the duty is on the State of New Jersey to prove this defendant guilty beyond a reasonable doubt, not beyond the shadow of a doubt, but beyond a reasonable doubt. Are you now saying to me that you wouldn't accept the law as I give it to you?

A. In conscience, no.

THE COURT: Do you want to be heard further?

MR. LORDI: I challenge for cause, sir.

THE COURT: She said she would not in conscience accept the law as I gave it to her.

MR. SOMMER: I have nothing to say, sir.

THE COURT: All right. I will grant your motion. I will excuse you for cause."

single rather than bifurcated trial of guilt and punishment, and finally because the death penalty serves no justifiable end.

We need say no more about the lack of standard or the single-bifurcated-trial issue. Neither subject, in our view, bears in a direct sense upon the Eighth Amendment issue. As to the question whether the death penalty serves a useful end, and its morality and fairness, these are matters which rest solely with the legislative branch of government. See *Trop v. Dulles,* 356 *U. S.* 86, 98, 78 *S. Ct.* 590, 2 *L. Ed.* 2d 630, 641 (1958); *United States v. Nelson,* 275 *F. Supp.* 261, 266–267 (*N. D. Cal.* 1967); *State v. Tomassi,* 75 *N. J. L.* 739, 746–747 (*E. & A.* 1908); *State v. McClellan,* 12 *Ohio App.* 2d 204, 232 *N. E.* 2d 414 (*Ct. App.* 1967). No doubt sentiment has shifted, and the use of the death penalty has become more restrained. *Task Force Report: The Courts* (The President's Commission on Law Enforcement and Administration of Justice, 1967), *p.* 27. Nonetheless the judiciary cannot say that the death penalty is now beyond "the limits of civilized standards," the concept articulated in *Trop v. Dulles.* A legislative commission in our State recommended retention of the death sentence in 1964, as we noted earlier, and a year later the Congress created a capital offense. 18 *U. S. C. A.* § 1751.

E

Finally it is contended that a defendant sentenced to death is constitutionally entitled to continuous counsel beyond the stage of direct review of his conviction. We do not see how that proposition bears upon the validity of the convictions here involved. Both Forcella and Funicello have been and are represented by counsel.

There is no need to discuss the circumstances in which counsel must be supplied in post-conviction proceedings. Certainly counsel should be furnished whenever it is at all reasonable to do so. We think it enough to say that the Public Defender is always available to bring before our

courts any issue which is not frivolous, and in this period of rapid change in constitutional doctrine, the Public Defender no doubt will be especially alert to the impact of new decisions upon men already under the death sentence.

### F

■ Funicello asks that we reconsider his claim that his confession was coerced, and says the purpose "in candor, is to assure the exhaustion of state remedies on this issue." We see no reason to reconsider, and we add that when an issue is adjudged, the state remedy is exhausted. See *State v. McKnight,* 52 *N. J.* 35 (1968.)

### CONCLUSION

For the foregoing reasons, the judgments in the Forcella and Funicello matters are affirmed, and as to Ornes and Perez, the motion to eliminate the death sentence from the trial of the pending indictments is denied.

FRANCIS, J. (concurring). I concur in the result reached in these cases. Moreover I agree thoroughly with the opinion of the Chief Justice with two qualifications which are relatively incidental to its principal thrust. For reasons expressed in my dissent in *State v. Laws,* 51 *N. J.* 494, *pp.* 549-555 (1968), I hold the view that neither a county prosecutor nor a trial court has authority to waive the death penalty in a first degree murder case, and further, 51 *N. J. pp.* 555–562, that our Court can and should adopt the bifurcated trial procedure in first degree murder cases.

JACOBS and HALL, J. J. (dissenting) : In the field of federal constitutional law, the decisions of the United States Supreme Court are of course binding upon all state courts. Our clear responsibility is to apply those decisions with due regard for their tenor, principles and goals in analogous situations with the aim of determining a matter as we con-

scientiously believe that Court would if the case were before it. *Roadway Express, Inc., et al. v. Director, Div. of Taxation,* 50 *N. J.* 471, 475 (1967), appeal dismissed, 390 *U. S.* 745, 88 *S. Ct.* 1443, 20 *L. Ed. 2d* 276 (1968). See *Schlemm v. Schlemm,* 31 *N. J.* 557, 571 (1960); *G. P. Putnam's Sons v. Calissi,* 50 *N. J.* 397, 398 (1967). On that approach we have no hesitancy in concluding that *N. J. S.* 2*A* :113–3 and *N. J. S.* 2*A* :113–4 may not constitutionally stand in their present form under the recent holdings in *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d* 138 (1968) and *Pope v. United States,* 392 *U. S.* 651, 88 *S. Ct.* 2145, 20 *L. Ed. 2d* 1317.

In *Jackson* the Court struck the death penalty in the Federal Kidnaping Act which provided for such punishment "if the verdict of the jury shall so recommend," and for imprisonment for a term of life "if the death penalty is not imposed." 18 *U. S. C.* § 1201(*a*). Under the statute a defendant could forego his fifth amendment right not to incriminate himself by tendering a plea of guilty which, if accepted by the trial judge (*F. R. C. P.* 11; *Lynch v. Overholser,* 369 *U. S.* 705, 719, 82 *S. Ct.* 1063, 8 *L. Ed. 2d* 211, 220 (1962)), would avoid the possibility of the death penalty. Or he could forego his sixth amendment right by tendering a waiver of jury trial which, if approved by the trial judge and consented to by the Government (*F. R. C. P.* 23(*a*); *Singer v. United States,* 380 *U. S.* 24, 85 *S. Ct.* 783, 13 *L. Ed. 2d* 630 (1965)), would result in nonjury trial without the possibility of the death penalty. Under either alternative, he was placed under extraordinary inducement to forego a constitutional right, for that was the only way he could insure himself against the awesome consequence. As forcefully expressed by Justice Stewart for the Court in *Jackson,* the inevitable and unconstitutional effect of the statutory arrangement was "to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial." 390 *U. S.,* at *p.* 570, 88 *S. Ct.,* at *p.* 1216, 20 *L. Ed. 2d,* at *p.* 147.

In the course of its argument in *Jackson,* the Government noted that Congress could have made capital punishment mandatory in all cases and that its selective death penalty procedure might therefore favorably be viewed as "ameliorating." *Cf. State v. Sullivan,* 43 *N. J.* 209, 245 (1964), *certiorari* denied, 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed.* 2d 477 (1966). Assuming all that, Justice Stewart pointed out that the congressional goal could be achieved "without penalizing those defendants who plead not guilty and demand jury trial" and without needlessly chilling "the exercise of basic constitutional rights." 390 *U. S.,* at *p.* 582, 88 *S. Ct.,* at *p.* 1216, 20 *L. Ed. 2d,* at 147. In response to the suggestion that the trial judges might be relied upon to reject coerced pleas of guilty and involuntary waivers of jury trial, he stressed that the evil in the federal statute was "not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them." And he noted: "the fact that the Federal Kidnaping Act tends to discourage deefndants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily." 390 *U. S.,* at *p.* 583, 88 *S. Ct.,* at *p.* 1217, 20 *L. Ed. 2d,* at *p.* 148.

In *Pope v. United States, supra,* the defendant was convicted by a jury and was sentenced to death under the Federal Bank Robbery Act. That statute provided that a person found guilty shall be imprisoned for not less than ten years "or punished by death if the verdict of the jury shall so direct." 18 *U. S. C. A.* § 2113(e). The Government conceded that under *Jackson* the Bank Robbery Act was unconstitutional and the Supreme Court, in the light of the concession "and upon an independent examination of the record" vacated the judgment and remanded, apparently "for resentencing." 88 *S. Ct.,* at *p.* 2145. In *Spillers v. State, Nev.* 436 *P. 2d* 18 (1968), cited in *Jackson* (390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d,* at *p.* 147), the Nevada Supreme Court struck its statute which authorized a death penalty where the

defendant was tried by a jury but not where he pleaded guilty or waived jury trial. In the course of his opinion for the court, Justice Zenoff referred to the possibility of death as the "terrible price" payable under the statute for excercise of the right to jury trial and he noted that "in some instances the compelling force may be so great as to cause one who is not guilty to plead guilty, or at least to attempt to place his case before the court at trial without a jury." 436 *P. 2d,* at *p.* 22.

In *Laboy v. State of New Jersey,* 266 *F. Supp.* 581 (*D. N. J.* 1967), Judge Lane found no significant difference between New Jersey's statutory arrangement and the Federal Kidnaping Act, though he disagreed with the lower court's declaration of unconstitutionality in *Jackson.* 266 *F. Supp.,* at *p.* 585. See also 22 *Rutgers L. Rev.* 167, 175 (1967) where the author, discussing the lower court opinion in *Jackson,* stated that "legislation such as the New Jersey homicide statute (which expressly precludes infliction of the death penalty if a defendant pleads *non vult*) would be clearly unconstitutional under the *Jackson* holding." Indeed, even the brief submitted to this Court by the Bergen County Prosecutor acknowledged unequivocally that "the rationale of *United States v. Jackson* applies to the New Jersey statutory scheme." Nonetheless, the majority opinion embraces a different point of view although its differentiations do not appear to us to be at all meaningful in the present context.

The opinion in *Jackson* makes it clear that the unconstitutionally operative effect of New Jersey's legislative scheme may not be disregarded simply because its motivation was to benefit murder defendants; and it makes it equally clear that the power to reject the plea (a power seldom exercised where the prosecutor has recommended its acceptance) presents no significant factor. 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d,* at *pp.* 147–148. It is true that unlike the federal practice, New Jersey omits the possibility of the nonjury trial. But that omission may well aggravate rather than mitigate the constitutional infirmity found in *Jackson.*

If a New Jersey defendant indicted for murder seeks to avoid the possibility of the death penalty, his only option is to tender a *non vult* plea, thereby waiving both his constitutional right not to incriminate himself and his constitutional right to a jury trial. In a sense his plight is even more desperate, and the burdens on his exercise of constitutional rights even more significant, than under the Federal Kidnaping Act where the defendant may seek to avoid the possibility of the death penalty by waiving his sixth amendment right while still retaining his fifth amendment right not to incriminate himself.

The encouragement to a New Jersey murder defendant to waive his constitutional rights is not only needless, since as pointed out in *Jackson* other constitutional avenues are readily available (390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d,* at *p.* 147), but is markedly strong. As Judge Forman aptly put it in *Application of Cicenia,* 148 *F. Supp.* 98 (*D. N. J. 1956*), affirmed, 240 *F. 2d* 844 (3 *Cir.* 1957), affirmed, *Cicenia v. La Gay,* 357 *U. S.* 504, 78 *S. Ct.* 1297, 2 *L. Ed. 2d* 1523 (1958), the difference between "pleading *non vult* and fighting on the merits is the difference between insuring life and risking death" (148 *F. Supp.,* at *p.* 101) and consequently "in capital cases in New Jersey there is an extraordinary encouragement to the accused to offer a plea of *non vult* if the court will accept it." 148 *F. Supp.,* at *p.* 102.

In *Spillers* the Nevada court indicated that the inducement might be so compelling as to cause one who is not guilty to plead guilty. 436 *P. 2d,* at *p.* 22. To that may be added the high danger in our own State that, in order to avoid the possibility of the death penalty, one guilty only of a lesser included offense would be induced to plead *non vult* unrestrictedly to the charge of murder. Indeed, under New Jersey practice, the *non vult* plea must be unrestricted and to the indictment itself, thereby effectively precluding a defendant from legally establishing that the offense was second degree murder or manslaughter or even

lesser in nature. See *State v. Williams,* 39 *N. J.* 471, 479, *certiorari* denied, 374 *U. S.* 855, 83 *S. Ct.* 1924, 10 *L. Ed. 2d* 1075 (1963). It seems hardly necessary to reiterate at this point that, under New Jersey's present statutory scheme, such a defendant in particular is being unnecessarily deterred from exercising his rights of nonincrimination and jury trial and is needlessly being penalized for the assertion of such constitutional rights, all within the declared proscriptions of *Jackson* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d,* at *pp.* 147–148.

Assuming that *Jackson* applies, the majority opinion holds that the *non vult* plea must go. This of course defeats the legislative policy which, ever since 1893 (*L.* 1893, *c.* 36), has declared that a murder defendant shall have the right to tender a *non vult* plea which, if accepted, will preclude the possibility of the death penalty. This policy was reasserted in the 1951 revision of the statutes. *N. J. S.* 2A:113–3. It is of course true that the Legislature has also expressed a policy in favor of the continuation of the death penalty when imposed by the jury (*N. J. S.* 2A:113–4) but under *Jackson* it is no longer possible to fulfill both of the legislative policies and a choice must now be made. We agree with the majority that retrogression to the pre-1893 mandatory death penalty would be unthinkable. We also agree that it is the Legislature's responsibility to choose for the future what policies should be followed, provided they are consistent with *Jackson.* But it appears to us that, pending such future legislation, the striking of the death penalty rather than the *non vult* plea would, in the light of modern-day movements and considerations, be the more satisfactory course, more nearly comport with legislative wishes, and more clearly conform to the tenor and rationale of *Jackson.*

In *Jackson* the Government had suggested that the federal act could be sustained by judicial elimination of all guilty pleas and waivers. Justice Stewart noted that this would require full-dress jury trials in all cases and, "apart

from the cruel impact of such a requirement upon those defendants who would greatly prefer not to contest their guilt," would "rob the criminal process of much of its flexibility." 390 *U. S.,* at *p.* 584, 88 *S. Ct.,* at *p.* 1218, 20 *L. Ed. 2d,* at *p.* 148. That course would not conform with the congressional wishes; nor is it likely to conform with the legislative wishes for the unfairness to the individuals concerned would be gross and patent and the resulting burden on the judicial system would be overwhelming.

In *Jackson* the death penalty was struck while the remaining portions of the statute were permitted to stand. The Court expressed the view that Congress would undoubtedly have enacted the statute without the death penalty if it had then been informed that it could not be included; it outlined the history of the statute, noting that it confirmed "what common sense alone would suggest." 390 *U. S.,* at *p.* 586, 88 *S. Ct.,* at *p.* 1219, 20 *L. Ed. 2d,* at *p.* 149. However, in *Pope,* the opinion striking the death penalty in the Bank Robbery Act made no mention at all of its history. Similarly in *Spillers* the court, in eliminating the death penalty provision in its rape statute, made no reference to its history or to the possibility that pleas and waivers might be stricken and the death penalty retained; such striking would involve great expansion of the use of the death penalty at a time in history when it is everywhere under attack and is being restricted more and more. In *Spillers* the death penalty fixed by the jury was vacated and the defendant was sentenced to a term of years. 436 *P. 2d,* at *pp.* 22–24. See *State v. Laws,* 51 *N. J.* 494 (1968).

The majority suggests that striking of the death penalty might still leave a *"Jackson-*type difficulty"* in that a defendant who pleads *non vult* would receive life or a term of years whereas a defendant found guilty by a jury of first degree murder would necessarily receive life. But the jury might return a lesser verdict and, in any event, the inducement here would be insignificant when compared to the death penalty stricken in *Jackson.* The law has always

been administered with pragmatic recognition of the fact that the difference between the death penalty and imprisonment entails more than matters of logic and degree. See *State v. Laws, supra,* 51 *N. J.* 494; *cf. Meszaros v. Gransamer,* 23 *N. J.* 179, 188 (1957); *State v. Wolf,* 46 *N. J.* 301, 308 (1966). *Jackson* was concerned solely with the grisly choice between a plea or waiver with an assurance of no death penalty, and a jury trial with the danger of a death penalty; it was not at all concerned with and did not mention the lesser inducements incident to the ordinary, though nonetheless troublesome, "plea bargaining." See Arnold, *Law Enforcement—An Attempt at Social Dissection,* 62 Yale L. J. 1 (1932); Note, *Guilty Plea Bargaining,* 112 *U. Pa. L. Rev.* 865, 878 (1964).

The urgent need for legislative restudy of New Jersey's murder laws is evidenced not only by *Jackson* but also by the tenor of other Supreme Court opinions such as *Witherspoon v. State of Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed. 2d* 776 (June 3, 1968). There the Court upset an Illinois statute which provided for the exclusion in murder trials of jurors who stated that they had conscientious scruples against capital punishment or stated that they were opposed to it. Its opinion pointed to increased disfavor of the death penalty (88 *S. Ct.* 1771, fns. 17–19) and left open issues (88 *S. Ct.* 1771, fns. 10, 11, 18) which will undoubtedly be among those pressed in the future by legal representatives of the growing number of Americans who, abhorred by the State's taking of life and disturbed by the baneful effect of capital punishment on the administration of criminal justice, seek replacement of the death penalty by life imprisonment. Additional issues such as bifurcation and standards, though dealt with by the majority, may nonetheless appropriately be given further consideration in the course of legislative restudy. It also seems to us that a most unfortunate aspect of the majority opinion, which disserves the public greatly, is that it reaches out to sanction completely the *status quo* thereby jeopardizing impending murder

proceedings and lending itself to legislative inaction in a field which cries out for early action.

In A-147 and A-164 we would vacate the death sentences and direct that the defendants be imprisoned for life; in A-148 and A-163 we would direct that the death penalty be eliminated from the forthcoming trials of the indictments.

*For affirmance* — Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, SCHETTINO and HANEMAN—5.

*For modification*—Justices JACOBS and HALL—2.